## FIELD PACKING CO. v. GLENN et al.

District Court, W. D. Kentucky.
April 20, 1933.

—.

F. R. Baird, of Chicago, Ill., and Wm. Marshall Bullitt and Leo T. Wolford, both of Louisville, Ky., for plaintiff.

Bailey P. Wootton, Atty. Gen., and S. H. Brown, Asst. Atty. Gen., for defendants.

Before MOORMAN, Circuit Judge, and COCHRAN and DAWSON, District Judges.

PER CURIAM.

This is a proceeding under section 266 of the Judicial Code (section 380, title 28, US CA). The plaintiff, a Kentucky corporation and a distributor of oleomargarine, seeks to have declared void, as contravening both the Federal and state Constitutions, that part of chapter 158 of the Acts of the 1932 Session of the General Assembly of Kentucky, which imposes a tax of ten cents per pound on all oleomargarine sold in the state.

The case is before us on a motion for a temporary injunction, restraining the state tax commission, the body charged by the statute with its enforcement, from enforcing or attempting to enforce its provisions. At the suggestion of the court, the proof has been developed as fully as if on final submission.

The claim of the plaintiff is that while the act complained of is clothed in the garb of a taxing law, it is, in reality, a prohibition of the sale of oleomargarine in Kentucky, and was so intended by the General Assembly; that this prohibition is the inevitable result of the tax, which, it is claimed, is so high as to render it impossible to sell oleomargarine in competition with dairy butter, its natural competitor; that oleomargarine is a pure, wholesome, and nutritious food product, a legitimate and well-recognized article of commerce, and its sale is not harmful to the public health, safety, or morals, and that while the General Assembly, under section 181 of the Constitution of Kentucky, may impose an excise or license tax upon the product or the sale thereof, without imposing a similar tax on butter, that section of the state Constitution does not authorize the imposition of a prohibitory tax on a legitimate business; that therefore the tax cannot be justified under

section 181 of the state Constitution, but is violative of the spirit of that section, as well as of those provisions of the Bill of Rights of the state Constitution securing to citizens the right of acquiring and protecting property, and prohibiting the exercise of absolute and arbitrary power over the lives, liberty, and property of the people. It is also claimed that the act violates the due process clause of the Fourteenth Amendment of the Constitution of the United States.

In view of the penalties provided in section 14 of the act, and the allegations of the bill as to the declared intention of the tax commission to enforce those penalties and of the inadequacy of the remedy at law, the bill makes out a case of equity jurisdiction, if the action is otherwise cognizable in a federal court. Indeed, we do not understand that defendants seriously question this. The claim that the act violates the due process clause of the Fourteenth Amendment presents a real and substantial controversy under the Constitution of the United States, and, as the jurisdictional amount is sufficiently alleged, this court has jurisdiction of the controversy, and this jurisdiction extends to a determination of all questions involved, including those of state law, even though we do not find it necessary to decide the federal question involved. Greene v. Louisville & N. R. Co., 244 U. S. 502, 37 S. Ct. 673, 61 L. Ed. 1280, Ann. Cas. 1917E, 88; Siler v. Louisville & N. R. Co., 213 U. S. 175, 29 S. Ct. 451, 53 L. Ed. 753.

Therefore, we shall first consider the validity of the act under the state Constitution.

We think the tax complained of is clearly an excise tax, and must find its justification in section 181 of the state Constitution, the pertinent part of which provides:

"The general assembly may, by general laws only, provide for the payment of license fees on franchises, stock used for breeding purposes, the various trades, occupations and professions, or a special or excise tax; and may, by general laws, delegate the power to counties, towns, cities and other municipal corporations, to impose and collect license fees on stock used for breeding purposes, on franchises, trades, occupations and professions."

This section of the Constitution has been frequently considered by the Court of Appeals of the state, and it is now well settled that this section must be read in connection with the Bill of Rights contained in the state Constitution, which forbids the exercise of arbitrary power over the lives, liberty, and property of citizens, and secures to all the inalienable right of acquiring and protecting property, and that, when so read, section 181 confers no power to prohibit or substantially prohibit, by taxation, a legitimate business, and any such prohibitory tax violates the Bill of Rights. Fiscal Court of Owen County v. F. & A. Cox Company, 132 Ky. 738, 117 S. W. 296, 21 L. R. A. (N. S.) 83; City of Louisville v. Pooley, 136 Ky. 286, 124 S. W. 315, 25 L. R. A. (N. S.) 582; Sperry & Hutchinson Co. v. Owensboro, 151 Ky. 389, 151 S. W. 932, Ann. Cas. 1915A, 373.

It is stipulated in the record that oleomargarine, as defined in the act and as sold by the plaintiff, "is a legitimate, well recognized, pure, nutritious and wholesome food, which is, and for many years has been, an established subject of intrastate and interstate commerce, and is not injurious to the public health, safety, welfare or morals." Therefore, under the state law, the controversy narrows itself to the single question of whether the tax is prohibitive of the legitimate business of selling oleomargarine. In the light of the record, this question must be answered in the affirmative. It is shown in the record that while oleomargarine is a healthful and nutritious food product, it is at such a disadvantage in competition with dairy butter that it can only compete or find a market when sold at a substantially lower price than butter. There is no disagreement in the testimony on this point, although there is some disagreement as to what the differential must be to enable oleomargarine to find an appreciable market. The evidence is practically unanimous, however, that when the differential falls below 10 cents per pound, oleomargarine sales are greatly reduced, and the preponderance of the evidence is that it is practically impossible for the product to be sold in competition with butter if the differential is substantially less than 10 cents per pound. The proof shows that by reason of the difference in the cost of manufacture of oleomargarine and butter and the greater desirability of butter, in prosperous times this differential, or a considerably greater one, can be profitably maintained by oleomargarine dealers.

It was developed in the evidence from a study of the relation of butter and oleomargarine prices made by Miss Grace Snodgrass, under the auspices of Stanford University Research Institute, that for the period extending from 1900 to 1929, both inclusive, oleomargarine sold at wholesale on the average at about 56 per cent. of the wholesale

price of butter. It is also in evidence, if evidence were necessary to establish such a self-evident fact, that the producers of each product sold it for the best prices obtainable. So it is a fair conclusion that that differential represented the concession oleomargarine dealers had to make to sell their product. It is also in evidence that the average profit of manufacturers of oleomargarine in ordinary times ranges slightly less than 2 cents per pound; of jobbers from 2½ cents to 3½ cents per pound, and of retailers from 2 to 2½ cents per pound. The average retail price of butter and oleomargarine and the differential in fifty-one cities of the United States for the years 1923 to 1931, both inclusive, and for the first seven months of 1932 are given in Martin Exhibits 4a and 4b. These tables show an average annual differential as follows:

1923 ................27 cts. per pound
1924 ................22 cts. per pound
1925 ................24.4 cts. per pound
1926 ................20.2 cts. per pound
1927 ................23.6 cts. per pound
1928 ................26.6 cts. per pound
1929 ................27.8 cts. per pound
1930 ................20.6 cts. per pound
1931 ................15.6 cts. per pound

—and for the seven months of 1932, 11.5 cents per pound. The record also gives the average annual wholesale prices of oleomargarine in the Chicago market and the high and low wholesale prices of butter in the New York market for each of the years prior to 1923, back to and including 1913, and the differential between the average wholesale price of animal fat and oleomargarine and the average of high and low butter prices was—

For 1914 ....................12.637 cents
1915 .................... 9.308 cents
1916 ....................13.711 cents
1917 ....................17.723 cents
1918 ....................22.587 cents
1919 ....................24.402 cents
1920 ....................26.245 cents
1921 ....................19.923 cents
1922 ....................19.942 cents

The differential between butter and vegetable oleomargarine was slightly greater.

If these figures told the whole story of the competition between butter and oleomargarine, we would hesitate to hold the tax prohibitive. The validity of the act, however, cannot be sustained simply because in the past the oleomargarine dealer had a differential in his favor sufficiently large to have enabled him to absorb the tax and realize a reasonable profit. If the experience of the oleomargarine industry since the enactment of the law has demonstrated that dealers have been unable to sell the product in competition with butter at a sufficient price to cover cost plus a reasonable profit plus the tax, then the law must be held invalid under the state Constitution. We think the record discloses that since the beginning of 1932, the manufacturer of oleomargarine has been compelled to sell his product to the distributor at from 9 to 11 cents per pound in order to realize any profit whatever. When the 10-cent tax is added to this cost, and any reasonable profit whatever is allowed to the distributor, the consumer must pay twenty cents or more per pound for the product. The record shows that beginning with January, 1932, there has been a steady decline in the retail price of butter —from 32.3 cents per pound in January to about 20 cents at the time the evidence was taken in September, 1932. On this showing it is apparent that the oleomargarine distributor, burdened with the 10-cent tax, has been compelled, since the enactment of the law, to ask substantially as much for his product as butter was selling for, and the record abundantly shows, from the actual experience of oleomargarine dealers in Kentucky, that this situation has practically destroyed the business in Kentucky. A tax which has had this effect upon a legitimate business ever since its enactment cannot be sustained as a valid exercise of the taxing power of the state under the state Constitution. We recognize the fact that at all times since the enactment of the law the country as a whole has been going through a terrible financial depression, but we must also recognize the fact that apparently the turn for the better has not yet come and no one can predict with any degree of certainty when we shall turn the corner. It is not within legislative competence, by taxation, to destroy a legitimate business in times of depression any more than in normal times, and, as we are living in subnormal times, the validity of the tax in question must be measured by its effect during these times. Under improved economic conditions it is conceivable that the tax complained of here would not be prohibitive. We are satisfied from the record that it is prohibitive now.

In view of the conclusions here announced, we refrain from passing upon the validity of the law under the Fourteenth Amendment. Therefore, the temporary injunction prayed for is granted.