STEWART DRY GOODS CO. *v.* LEWIS ET AL.*

No. 454. Argued February 8, 1935.—Decided March 11, 1935.

---

* Together with No. 455, *Levy et al.* v. *Lewis et al.*, and No. 456, *J. C. Penney Co.* v. *Lewis et al.* Appeals from the District Court of the United States for the Western District of Kentucky. Also No. 457, *Kroger Grocery & Baking Co.* v. *Lewis et al.* Appeal from the District Court of the United States for the Eastern District of Kentucky.

*Mr. Robert S. Marx,* with whom *Messrs. Frank E. Wood, John C. Doolan, Harry Kasfir,* and *James W. Stites* were on the brief, for appellants.

*Messrs. S. H. Brown* and *Francis M. Burke,* Assistant Attorneys General of Kentucky, with whom *Mr. Bailey P. Wootton,* Attorney General, and *Mr. Leslie W. Morris* were on the brief, for appellees.

MR. JUSTICE ROBERTS delivered the opinion of the Court.

These are four suits heard by a specially constituted District Court in Kentucky, to enjoin state officers from enforcing an act of that Commonwealth imposing a gross sales tax. The plaintiffs are, respectively, a domestic corporation conducting a department store in Louisville, a partnership operating a similar store in the same city, a Delaware corporation having 21 department stores in Kentucky, and an Ohio corporation maintaining 289 grocery stores within the Commonwealth. Nineteen individuals, partnerships and corporations, proprietors of one or more stores selling various lines of merchandise, intervened as plaintiffs. Interlocutory injunctions issued, but the district court of three judges dismissed the bills for want of equity, being of opinion there was an adequate remedy at law. Upon appeal this court reversed the decrees and remanded the causes.[1] At final hearing the district court found the remedy at law inadequate, but sustained the act and dismissed the bills.[2] The present appeals are upon the merits.

[1] 287 U. S. 9.
[2] 7 F. Supp. 438; 8 F. Supp. 396.

The statute became a law March 17, 1930. The title and certain sections are copied in the margin; other sections are there summarized.[3] The tax imposed upon the first

[3] Chapter 149, Acts of 1930, p. 475.

"An Act relating to revenue and taxation, imposing an excise or license tax on retail merchants, as the words 'retail merchants' are used in this act; providing for the collection of such tax; the distribution and use of the revenue derived therefrom; the administration of said law, fixing fines and penalties for the violation of this act; declaring an emergency to exist, and repealing all laws in conflict with the provisions of this act.

" Be it Enacted by the General Assembly of the Commonwealth of Kentucky:

" § 1. The words 'retail merchant,' as used in this act, shall mean and include every person, firm, association, co-partnership or corporation opening, establishing, operating or maintaining any 'store,' as defined herein, for the purpose of and selling goods, wares or merchandise at retail in this State, except those actually engaged in gardening or farming and selling garden or farm products raised by them in this State. The term 'store,' as used in this act, shall be construed to mean and include any store or stores or any mercantile establishment or establishments in this State which are owned, operated, maintained or controlled by the same 'retail merchant,' as defined herein, either domestic or foreign, in which goods, wares or merchandise of any kind, are sold at retail. The provisions of this act shall be construed to apply to every 'retail merchant' and 'store,' as defined herein, which is controlled or held with others by majority stock ownership or ultimately controlled or directed by one management or association of ultimate management.

" § 2. Every retail merchant, as defined herein, shall pay an annual license tax for the opening, establishing, operating or maintaining of any store or stores, as defined herein, determined by computing the tax on the amount of gross sales as follows:

" One-twentieth of one per cent of the gross sales of Four hundred thousand ($400,000.00) Dollars or less; two-twentieths of one per cent on the excess of the gross sales over Four hundred thousand ($400,000.00) Dollars and not exceeding Five hundred thousand ($500,000.00) Dollars; five-twentieths of one per cent on the excess of the gross sales over Five hundred thousand ($500,000.00) Dollars and not exceeding Six hundred thousand ($600,000.00) Dollars;

$400,000 of annual gross sales is 1/20th of one per cent. The rate increases on each additional $100,000 of sales between $400,000 and $1,000,000, inclusive, being 17/20ths of one per cent. in the last bracket. On sales over $1,000,000 the rate is one per cent. The increased rates are applicable, however, only in respect of sales in each successive bracket, and therefore the tax burden attributable to $1,100,000 of sales is not one per cent., but a composite ascertained by adding the total tax for the sales falling within the various brackets, and dividing by the dollar-value of all sales. Thus the act requires the merchant to pay in the total .05 per cent. on $400,000 of sales, .305 per cent. on $1,000,000 of sales and .96 per cent. on $15,000,000 of sales.

The appellants charge that the statute violates several sections of the Constitution of Kentucky and several provisions of the Federal Constitution. We shall not stop to enumerate these, since we must sustain the claim that the classification made by § 2 denies the appellants the equal protection of the laws assured by the Fourteenth Amendment.

---

eight-twentieths of one per cent on the excess of the gross sales over Six hundred thousand ($600,000.00) Dollars and not exceeding Seven hundred thousand ($700,000.00) Dollars; eleven-twentieths of one per cent on the excess of the gross sales over Seven hundred thousand ($700,000.00) Dollars and not exceeding Eight hundred thousand ($800,000.00) Dollars; fourteen-twentieths of one per cent on the excess of the gross sales over Eight hundred thousand ($800,-000.00) Dollars and not exceeding Nine hundred thousand ($900,-000.00) Dollars; seventeen-twentieths of one per cent on the excess of the gross sales over Nine hundred thousand ($900,000.00) Dollars and not exceeding One million ($1,000,000) Dollars; one per cent on the excess of the gross sales over One million ($1,000,000.00) Dollars."

§ 3 provides for annual returns to the state tax commission, assessment and payment of the tax. § 4 allows certain credits for other taxes. § 7 makes it a misdemeanor, punishable by fine or imprisonment, to fail to file returns and pay the tax.

The trial court's relevant findings are: The act is essentially a revenue measure. The tax is on gross sales, not on gross collections from vendees. Sales made by merchants taxed under any of the brackets of the act are made in competition with like sales of the same character of merchandise by those who are taxed under other brackets. As a general proposition increased volume of sales results in increased profits and increased ability to pay the tax. The rate of profit from retail sales generally varies with the character of the goods sold. The management of a store or stores is one of the fundamental factors in determining whether or not a profit is realized and the amount of profit. As a general proposition those merchants doing the largest amount of trade are enabled to secure the highest type of management.

In the light of these findings, does the act tax sales in an unequal and arbitrary way, classifying them for the imposition of different rates without reference to any real or substantial distinction, as appellants insist; or does it impose an excise upon the conduct of retail business, reasonably adjusted in amount with regard to substantial differences in the nature of the privilege exercised, as appellees contend?

In resolving the issue we are not concluded by the name or description of the tax as found in the act; our duty is to ascertain its nature and effect.[4] " The substance and not the shadow determines the validity of the exercise of the power." [5] The act does not impose an income or profits tax, or a license tax, is not an inspection measure, or a police regulation. The tax is not confined to a par-

---

[4] *Galveston, H. & S. A. Ry. Co.* v. *Texas,* 210 U. S. 217, 227; *Choctaw, O. & G. R. Co.* v. *Harrison,* 235 U. S. 292, 298; *Crew Levick Co.* v. *Pennsylvania,* 245 U. S. 292, 294; *Shaffer* v. *Carter,* 252 U. S. 37, 55; *Dawson* v. *Kentucky Distilleries Co.,* 255 U. S. 288, 292; *St. Louis Cotton Compress Co.* v. *Arkansas,* 260 U. S. 346, 348.

[5] *Postal Telegraph Cable Co.* v. *Adams,* 155 U. S. 688, 698.

ticular method of merchandising. All retailers, individual and corporate, selling every description of commodities, in whatever form their enterprises are conducted, make up the taxable class. And the excise is laid in respect of the same activity of each of them—the making of a sale. Although no difference is suggested, so far as concerns the transaction which is the occasion of the tax, between the taxpayer's first sale of the year and his thousandth, different rates may apply to them. The statute operates to take as the tax a percentage of each dollar due or paid upon every sale, but increases the percentage if the sale which is the occasion of the tax succeeds the consummation of other sales of a specified aggregate amount. As found by the court below, the act of making a sale, which with all others made in the taxable year represents a total sales price of $400,000 or less, results in the imposition of a tax of 1/20th of one per cent. upon the price, whereas the making of the same sale by one who has theretofore sold $400,000 but less than $500,000 worth of goods entails a tax of 2/20ths of one per cent., or by one whose prior sales aggregate $900,000, a tax of 17/20ths of one per cent.

In connection with other provisions of the fundamental law, this court has had occasion to analyze similar acts. In *Brown* v. *Maryland,* 12 Wheat. 419, a tax on the occupation of an importer was held a tax on imports obnoxious to the commerce clause. Said the court (p. 444): "It is impossible to conceal from ourselves, that this is varying the form, without varying the substance . . . All must perceive, that a tax on the sale of an article, imported only for sale, is a tax on the article itself." In *Cook* v. *Pennsylvania,* 97 U. S. 566, a tax on the amount of an auctioneer's sales was declared a tax on the goods sold. In *Crew Levick Co.* v. *Pennsylvania,* 245 U. S. 292, a state tax on the business of selling goods in foreign commerce, measured by gross receipts from goods so sold and shipped, was pronounced an impost upon exports. The court said

(p. 297): " . . . nor is it an occupation tax except as it is imposed upon the very carrying on of the business of exporting merchandise. It operates to lay a direct burden upon every transaction in commerce by withholding, for the use of the State, a part of every dollar received in such transactions." *Panhandle Oil Co.* v. *Knox,* 277 U. S. 218, decides a privilege tax imposed on sellers of gasoline, fixed at so many cents per gallon sold, is a tax on sales. At page 222 the court said: " Sale and purchase constitute a transaction by which the tax is measured and on which the burden rests. . . . To use the number of gallons sold . . . as a measure of the privilege tax is in substance and legal effect to tax the sale." And in *Indian Motocycle Co.* v. *United States,* 283 U. S. 570, a federal tax upon motorcycles " sold . . . by the manufacturer " was held to be an excise on the sale, and the doctrine of the *Panhandle* case was reaffirmed.

Thus understood, the operation of the statute is unjustifiably unequal, whimsical and arbitrary, as much so as would be a tax on tangible personal property, say cattle, stepped up in rate on each additional animal owned by the taxpayer, or a tax on land similarly graduated according to the number of parcels owned.

The appellees seek to avoid the arbitrary character of the classification of sales for the purpose of imposing the levy by the claim that the act, properly construed, lays an excise upon the privilege of merchandising at retail and the exaction is made only for this privilege. They insist the amount of tax is merely measured by the volume of sales,[6] and in this view the classification is not arbitrary if any reasonable relation can be found between the amount demanded and the privilege enjoyed. They en-

---

[6] Franchise taxes measured by net income have been sustained, as not constituting a tax on income: *Educational Films Corp.* v. *Ward,* 282 U. S. 379; compare *Macallen Co.* v. *Massachusetts,* 279 U. S. 620; *Pacific Co.* v. *Johnson,* 285 U. S. 480.

deavor to deduce such a relation from the alleged fact that a merchant's net income and his consequent ability to pay increase as the volume of his sales grows. The argument does not advance the case for the validity of the statute. Even in this aspect the classification is arbitrary, for the claimed relation of gross sales—the measure of the tax— to net profits fails to justify the discrimination between taxpayers.

The district court found that " generally speaking " he who sells more is in receipt of a greater profit and hence has larger ability to pay, and upon this basis justified the classification. But it is to be remembered that the act in question taxes gross sales and not net income. As stated in *United States Glue Co.* v. *Town of Oak Creek,* 247 U. S. 321, 328:

" The difference in effect between a tax measured by gross receipts and one measured by net income, recognized by our decisions, is manifest and substantial, and it affords a convenient and workable basis of distinction between a direct and immediate burden upon the business affected and a charge that is only indirect and incidental. A tax upon gross receipts affects each transaction in proportion to its magnitude and irrespective of whether it is profitable or otherwise. Conceivably it may be sufficient to make the difference between profit and loss, or to so diminish the profit as to impede or discourage the conduct of the commerce. A tax upon the net profits has not the same deterrent effect, since it does not arise at all unless a gain is shown over and above expenses and losses, and the tax cannot be heavy unless the profits are large."

Argument is not needed, and indeed practical admission was made at the bar, that the gross sales of a merchant do not bear a constant relation to his net profits; that net profits vary from year to year in the same enterprise; that diverse kinds of merchandise yield differing ratios of profit;

and that gross and net profits vary with the character of the business as well as its volume. The trial court made no finding that the relation between gross sales and net profits, or increase of net worth, was constant, or even that there was a rough uniformity of progression within wide limits of tolerance. Expert witnesses, using data assembled from various reporting agencies, endeavored to establish that net profits or net worth grow with increased sales. But their testimony not only indicated great variations within each class selected for comparison, but also showed that in some of the classes representing the greater amount of sales the net profit or addition to net worth is smaller than in a class having less aggregate sales. The best that can be said for this evidence is that, averaging the results of the concerns making the reports, it is true " generally speaking," as the court below put it, that profits increase with sales. The ratio of increase, however, differs in different lines of activity and even as between concerns carrying on the same business, and so many exceptions and reservations must be made that averages are misleading. The proofs submitted are insufficient to support the appellees' contention that the graduation of the tax was adjusted with reasonable approximation to the net earnings of the taxpayers, and that such minor and incidental inequalities as may be found are those always incident in the application of any valid general rule of classification. We think the graduated rates imposed were not intended to bear any relation to net profits. The argument based upon the asserted analogy to a tax upon net income graduated in accordance with the size of the income is unconvincing, for the exaction here demanded is not of that kind.

We are told that the gross sales tax in question is in truth a rough and ready method of taxing gains under the guise of taxing sales; that it is less complicated and more convenient of administration than an income tax; and

Kentucky for these reasons is at liberty to choose this form, and to ignore the consequent inequalities of burden in the interest of ease of administration. The argument is in essence that it is difficult to be just, and easy to be arbitrary. If the Commonwealth desires to tax incomes it must take the trouble equitably to distribute the burden of the impost. Gross inequalities may not be ignored for the sake of ease of collection.

The assertion that a graduated income tax, like the graduated sales tax under consideration, ignores the varying rates of return upon investment of those carrying on similar enterprises, is obviously inaccurate. An income levy, by its very nature, assures equality of treatment, because the burden of the exaction varies with increase or decrease of return on capital invested and with the comparative success or failure of the enterprise. If, as argued, larger merchants are more efficient, their efficiency will be correspondingly reflected in their net earnings. If, as claimed, they are able to procure better management, a tax upon gains will uniformly reflect the effects of such management. And the same principle holds true of every advantage said to inhere in the magnitude of a business.

As we have said, the statute does not purport to levy a tax on incomes. Plainly it does not in fact do so. A merchant having a gross business of $1,000,000, but a net loss, must pay a greater tax than one who has a gross of $400,-000, and realizes a substantial net profit. The record discloses such a situation. In the year 1930, 24,186 merchants were subject to the tax. Two of these, whose gross sales amounted to 8 per cent of the gross sales of all merchants, would have paid, but for the interlocutory injunction entered by the court below, more than half of the total tax due by all those subject to the impost. The payment by one of them would have been about $124,000, or $18,000 in excess of the total tax paid by the 24,163 merchants who reported $362,000 of gross sales, and of whom 24,128 had

sales totaling less than $400,000; and this taxpayer had in Kentucky in that year a net income of approximately $172,000. The figures for 1931 and 1932 exhibit a like disparity. In the latter year the company last mentioned, though having sales in Kentucky amounting to $11,447,-611, would, after payment of the tax, have shown a net loss of over $9,000. To assert that a law, thus operating, reasonably equates the exaction to net income is to ignore the facts.

The appellees say there is no showing that the tax in its actual operation is unduly burdensome or harmful to any of the appellants or amounts to confiscation of their property. The assertion is irrelevant to the issue of inequality, and is, moreover, contradicted by the record. In the case of one plaintiff whose sales in Kentucky in 1930 were over $14,500,000, in 1931 over $13,400,000 and in 1932 over $11,400,000, the net profits in the same state, after deducting the sales tax, would have been in 1930, $48,677, in 1931, $39,358, and in 1932 it would have shown a loss of $9,023. In the light of this demonstration, it is difficult to follow the argument that the constitution of Kentucky, as construed by her courts, is a shield against any tax law imposing an excise, the effect of which is to extinguish all profits, when we are told by appellees in the next breath, that this very statute has been upheld by the Supreme Court of Kentucky against constitutional attack.[7] But if that court had not spoken on the subject, these appellants are not to be denied relief under the Fourteenth Amendment, by resort to a forecast of possible amelioration of their situation by the state courts.

Ignoring the glaring inequalities of burden resulting from the statute, the appellees tell us that if and when the load becomes too heavy upon any taxpayer, he may

[7] See *Moore* v. *State Board of Charities and Corrections*, 239 Ky. 729; 40 S. W. (2d) 349.

with confidence invoke the Fourteenth Amendment.[8] The position seems to be that different principles govern various forms of taxation, and that what has been held with respect to the unrestricted power of a legislature to determine the amount to be exacted by other forms of taxation has no application to an excise. We are unaware of any such distinction in logic and the authorities sanction none. Every taxing law must pass the constitutional test applied by the courts to the method of imposition, but the measure of the impost rests in the discretion of the legislature.

To condemn a levy on the sole ground that it is excessive would be to usurp a power vested not in the courts but in the legislature, and to exercise the usurped power arbitrarily by substituting our conceptions of public policy for those of the legislative body. In *Veazie Bank* v. *Fenno*, 8 Wall. 533, a tax of ten per cent. on the notes of state banks was upheld although it " drove out of existence every State bank of circulation within a year or two after its passage." See *Loan Association* v. *Topeka*, 20 Wall. 655, 663, 664. In *Knowlton* v. *Moore*, 178 U. S. 41, in sustaining an excise tax this court said, " if a lawful tax can be defeated because the power which is manifested by its imposition may when further exercised be destructive, it would follow that every lawful tax would become unlawful, and therefore no taxation whatever could be levied." (P. 60.) See also, *Magnano Company* v. *Hamilton*, 292 U. S. 40; *Fox* v. *Standard Oil Co. ante*, p. 87.

---

[8] By Public Act No. 24, Laws of 1933, Vermont imposed a graduated gross sales tax increasing from ⅛ of one per cent on sales of from fifty thousand to one hundred thousand dollars to four per cent. on sales above two million dollars. A levy of a similar sort applied in Kentucky, as shown by the facts proved in the present record, would have deprived many merchants in various tax brackets of all net income from their stores. We were informed at the argument that this statute has been held unconstitutional by a court of first instance.

Once the lawfulness of the method of levying the tax is affirmed, the judicial function ceases. He deludes himself by a false hope who supposes that, if this court shall at some future time conclude the burden of the exaction has become inordinately oppressive, it can interdict the tax.

The suggestion is made that the *ad valorem* property tax heretofore laid on Kentucky merchants bears more heavily upon the little dealer than upon his bigger competitor, as the real estate and stock of merchandise of the former is greater in proportion to the business done than is the case with the latter. This fact may indeed be a proper reason for adjusting the tax burden so as better to reflect the fruits of the enterprise; but it can afford no excuse for an arbitrary and unequal imposition as between persons similarly circumstanced. The record fails to show that an income tax or a flat tax on sales would not accomplish the desired end. The adoption of laws of the latter description by many of the states is a practical confirmation of the view that they are effective measures.[9]

The appellees refer to certain decisions of this court, but none of them rules this case. Those claimed to be particularly pertinent will be briefly noted.

---

[9] Arizona Laws, 1933, c. 18; California Laws, 1933, c. 1020; Georgia, Code 1930, Supplement, Act of 1929, § 993(316); Illinois, Act of June 28, 1933, Laws, 58th Gen. Assembly, p. 924; Indiana, Burns Ind. Stats., 1933, c. 26, § 64–2601; Iowa, c. 82, Laws 45th Gen. Assembly, Extra Sess., § 37ff; Kentucky, c. 25, Ky. Acts, Special Sess., 1934; Michigan, Public Acts, Sess. 1930, No. 167; Mississippi, G. L. 1934, c. 119; Missouri, Laws, Extra Sess. 1934, p. 155; New York, Cahill's Consol. Laws, 1933 Supp., c. 61, Art. 17, § 390, p. 144; North Carolina, Sess. 1933, c. 445, p. 768; Ohio, Page's Ohio General Code, § 5546–1, p. 859; Oklahoma, First Spec. Sess. 1933, c. 196, p. 456; Pennsylvania, Act Aug. 19, 1932, Special Sess. 1932, § 3, p. 92; South Dakota, Laws, 1933, § 184; Utah, Laws, 1933, c. 63 as amended by c. 20, Second Special Session, 1933; Washington, Laws, 1933, c. 191, p. 869; West Virginia, Act of May 26, 1933, Extra Session, c. 33, p. 219.

In *Clark* v. *Titusville*, 184 U. S. 329, the tax levied consisted of a flat fee exacted for a license which entitled the merchant to conduct business for the ensuing year. The lowest fee was $5.00, for a merchant who during the year preceding that covered by the license had made sales not in excess of $1,000. A $10.00 fee applied to one who had sales between $1,000 and $2,500; a $15.00 fee to one having sales between $2,500 and $5,000; a $25.00 fee to one whose sales were between $5,000 and $10,000; and so on to a fee of $100.00 for the seller of $60,000 worth or more. It is important to note the grounds of attack. One was that the classes were so defined that a merchant with sales of $2,499 would pay at one rate and another with sales of $2,501 would pay at a higher rate; that a merchant whose sales were $1,001 would pay the same fee as one whose sales were $2,499. In overruling this objection, the court relied upon the principle that some injustice is bound to result from any general rule of classification, and equal protection demands only reasonable uniformity in dealing with parties similarly circumstanced. A second objection was that the percentage of tax to sales was greater in the lower than in the higher brackets—that is, that a merchant selling goods for $60,000 or more paid a less percentage of his sales by way of tax than the smaller merchant who sold only $1,000 worth of goods. The objection was unavailing, because the tax did not purport to be fixed upon a percentage of sales. The purpose was to charge a larger license fee to a larger business. Any tax measured by a fixed and uniform percentage of gross sales would impose a heavier burden on the taxpayer having the greater volume of sales. The excise here involved is not of that sort, the sum exacted from the merchant doing the larger business being not only greater in gross amount but larger in proportion to sales, than that demanded of his smaller competitor.

In *Metropolis Theatre Co.* v. *Chicago,* 228 U. S. 61, a licensing ordinance provided for a greater license to be paid by theatres charging a higher rate for tickets than was exacted from those charging lower rates. This court sustained the classification upon the ground that the distinction between the sorts of theatres classified obtains in every large city of the country; and said (p. 69): " It will immediately occur upon the most casual reflection that the distinction the theatre itself makes is not artificial and must have some relation to the success and ultimate profit of its business. In other words, there is a natural relation between the price of admission and revenue, some advantage certainly that determines the choice. . . . The reason for it must therefore be substantial, and if it be so universal in the practice of the business it would seem not unreasonable if it be adopted as the basis of governmental action." The case falls within the principle that even a small difference in the method of conducting business may be availed of by government in imposing different taxes. It furnishes no support for a tax upon the sales of merchants at rates varying per sale or per dollar with the amount of their respective gross sales.

In several recent cases [10] we sustained the classification of chain stores for taxation at rates higher than those applicable to single stores, and graduated upward on each store as the total number of units in one ownership increased. We found this classification reasonable because of advantages incident to the conduct of multiple stores and obvious differences in chain methods of merchandising as contrasted with those practised in the operation of one store. The instant cases present a classification of quite another kind. The Kentucky statute ignores the form of

---

[10] *State Board of Tax Commissioners* v. *Jackson,* 283 U. S. 527; *Louis K. Liggett Company* v. *Lee,* 288 U. S. 517; *Fox* v. *Standard Oil Co., ante,* p. 87.

organization and the method of conducting business. The taxable class is retail merchants, whether individuals, partnerships or corporations; those who sell in one store or many; those who offer but one sort of goods and those who through departments deal in many lines of merchandise. The law arbitrarily classifies these vendors for the imposition of a varying rate of taxation, solely by reference to the volume of their transactions, disregarding the absence of any reasonable relation between the chosen criterion of classification and the privilege the enjoyment of which is said to be the subject taxed. It exacts from two persons different amounts for the privilege of doing exactly similar acts because the one has performed the act oftener than the other. We hold the act unconstitutional, and reverse the judgment.

*Reversed.*

MR. JUSTICE CARDOZO, dissenting.

The prevailing opinion commits the court to a holding that a tax upon gross sales, if laid upon a graduated basis, is always and inevitably a denial of the equal protection of the laws, no matter how slight the gradient or moderate the tax.

In the view of the majority, the relation between the taxpayer's capacity to pay and the volume of his business is at most accidental and occasional. In the view of the legislature of Kentucky and of its highest court (*Moore* v. *State Board of Charities and Corrections,* 239 Ky. 729; 40 S. W. (2d) 349), the relation, far from being accidental or occasional, has a normal or average validity, attested by experience and by the judgment of trained observers. The one view discovers in the attempted classification an act of arbitrary preference among groups essentially the same. The other perceives in the division a sincere and rational endeavor to adapt the burdens of taxation to the teachings of economics and the demands of social justice.

A theory readily intelligible, whether it be sound or unsound, underlies the adoption of the graduated levels. Economically, the theory is that there is a minimum of size for business units below which efficiency is less on the average than expansion would tend to make it; that there are intermediate levels within which efficiency is subject on the average to progressive development; and that there is an ultimate level beyond which efficiency, even if promoted, goes forward more slowly and at a diminishing ratio. Socially, the theory is that just as in taxes upon income or upon transfers at death, so also in imposts upon business, the little man, by reason of inferior capacity to pay, should bear a lighter load of taxes, relatively as well as absolutely, than is borne by the big one. For the purposes of retail business, the first or less efficient class is identified by the Kentucky statute with merchants whose gross sales are $400,000 or less; the six intermediate classes begin at that point and end with a million dollars; the final class is made up of those whose sales are over a million. For the first class the effective rate is 1/20 of 1 per cent; for the last it gradually approaches, though it can never quite reach 1 per cent, this by reason of the fact that the taxpayer in the higher brackets gets the benefit of the application of the lower rates to those parts of the gross sales that fall within the lower levels.

For many years Kentucky taxed her retail merchants upon the basis of property or capital employed within the state. Tolman, The Gross Sales Tax in Kentucky, 10 Tax Mag. 89, 112. The tax thus apportioned bore heavily upon the small retailer in comparison with the large one. This was so for several reasons developed with full statistics by students of taxation. Tolman, *loc. cit., supra,* citing Government of Kentucky, Report of the Efficiency Commission of Kentucky, vol. II, p. 232, and Martin & Patton, Operations of Real Estate Tax in Lexington, Ky., (Bureau of Business Research, University of Kentucky,

568

MS.) Perhaps the chief reason is the rapidity of turnover in large scale enterprises, the effect of this mobility being to reduce the value of the property that must be kept on hand at tax day as well as at other times. Tables in the record bear witness in a striking way to the resulting inequality. Upon the basis of a property tax a merchant with sales of $10,000,000 was found to pay less than one-half as much tax per dollar of sales as did a merchant whose sales were $150,000 or less. Cf. Tolman, *loc. cit., supra;* also Statutes of Kentucky, § 4189–2. More concretely, Kroger, one of the petitioners, with gross sales of many millions, paid a tax upon the old basis of only 137/1000 of one per cent in proportion to its sales in comparison with an average of 934/1000 of one per cent paid by the 16,535 merchants whose sales were less than $400,-000 annually. Tolman, *loc. cit., supra.* Kentucky is not chargeable with oppressive discrimination in superseding such a method of taxation by one more nearly equal in its burdens.

The choice of a new method made it necessary for the legislature to strike a balance of advantage. Tolman, *op. cit., supra,* at p. 90; Haig and Shoup, The Sales Tax in the American States, Columbia University Press (1934), p. 159 *et seq.* For a time there was a suggestion of a tax on chain stores only, but a lower federal court had held that method to be unlawful (38 F. (2d) 652), and the decision of this court to the contrary (*State Board of Tax Commissioners* v. *Jackson,* May, 1931, 283 U. S. 527), had not yet been announced. To be sure there was the possibility of a tax upon gross sales at a flat rate without graduated levels, but a burden so imposed might be subject to new objections. In the view of serious students of the problem, a flat tax upon gross sales is not always shifted to the consumer. It is often absorbed more or less by the seller, for a time, even if not permanently, to prevent the falling off of sales.

National Industrial Conference Board, General Sales or Turnover Taxation (1929), pp. 8, 9, *et seq.*; Buehler, Recent Developments of the General Sales Tax, 36 Journal of Pol. Econ. 83, 92, 93. Such at least is the teaching of a school of economists, though the subject is one as to which the learned are divided.[1] At times absorption is accomplished by a reduction of the price even when in form the amount of the tax has been added to the bill. Haig & Shoup, *op. cit., supra*, pp. 29, 31 *et seq.*; Buehler, General Sales Taxation (1932), pp. 194, 195. An impressive body of opinion is back of the view that in so far as the tax is not passed to the consumer the flat rate bears more heavily on the small business than on the large one. This tendency is corrected when the tax is imposed on a graduated basis. One of the consequences of such a tax is to make the shifting of the burden easier for those who pay the lower rates than for those who pay the higher ones. For that reason the flat rate is thought to be less efficient than the graded one as an instrument of social justice. The large dealer, it is said, occupies, both absolutely and relatively, a position of economic superiority by reason of the volume of his business. In that view, to make his tax heavier, both absolutely and relatively, is not arbitrary discrimination, but an attempt to proportion the payment to capacity to pay and thus to arrive in the end at a more genuine equality. By the statute in controversy the Commonwealth of Kentucky is aligned with that position. It is not the function of a court to make itself the arbiter between competing economic theories professed by honest men on grounds not wholly frivolous. *Otis* v. *Parker,* 187 U. S. 606, 609. Responsibility for economic wisdom has been laid upon the legislature. There is finality in its choice, even though wis-

---

[1] The problem is discussed by STONE, J., with a reference to many treatises on finance, in his dissenting opinion in *Indian Motocycle Co.* v. *United States,* 283 U. S. 570, 581.

dom may be lacking, unless choice can be found to be so void of rationality as to be the expression of a whim rather than an exercise of judgment.

The question then is whether there is rationality in the belief that capacity to pay increases, by and large, with an increase of receipts. Certain it is that merchants have faith in such a correspondence and act upon that faith. A witness for the petitioners tells us: "The policy prevailing throughout the United States, so far as retail merchandising department stores are concerned, is to get as large a volume as possible with a small percentage of profit, allowing the volume to produce the net profit." If experience did not teach that economic advantage goes along with larger sales, there would be an end to the hot pursuit for wide and wider markets. Official statistics in Kentucky confirm the impulse of her merchants, an impulse shared with merchants everywhere. Tables prepared by a witness on the basis of returns to the State Tax Commission show that persons and corporations whose sales were over $1,000,000 had net earnings between $125,000 and $400,000; those with sales between $600,000 and $800,000 had net earnings of $35,000 to $60,000; those with sales between $200,000 and $450,000 had net earnings of $5,000 to $34,000, with the exception of one concern which was conducted at a loss; and those with smaller sales had net earnings ranging from $10,000 to nothing. This does not mean that an increase of gross sales in one business brought the same increase of net earnings as an increase of gross sales in every other business. It does not mean that larger sales brought net earnings in a mounting ratio, relatively as well as absolutely. It does mean, however, that on the whole, net earnings in a business were higher when sales were large than they were in the same business when sales were comparatively small. In brief there is a relation of correspondence between capacity to pay and the amount of business done. Ex-

ceptions, of course, there are. The law builds upon the probable, and shapes the measure of the tax accordingly.

It is no answer to say that as between one business and another, or even as between one person and another engaged in the same business, there will be varying rates of return upon the amount of the investment. This is true also of a tax on net income. Net earnings of $100,000 may represent for one man a return on a capital of $2,000,000 and for another a return on a capital of double that amount, yet the tax will be the same for each. So also it is no answer to say that in the administration of this statute two merchants whose sales are very large are subject to as heavy a tax as many thousands of merchants whose sales are in the lowest brackets. One might as well compare the federal income tax of a banker whose net earnings are in the millions with that of a thousand clerks who by reason of exemptions are to pay no tax whatever. The comparison proves nothing unless it be the obvious fact that taxpayers are few when the count is at the highest level. Once more, it is no answer to say that though capacity to pay is enlarged on the average by an increase of the sales, there are times when sales increase and yet the outcome is a loss. No loss has been suffered by any of the petitioners, unless it be in one instance as the result of inefficiency, and so the findings show. In so far as the statute fails to make allowance for the contingency of loss, it is certainly not arbitrary in its operation as to those realizing a gain, and they will not be heard to complain that it is arbitrary as to others. *Hatch* v. *Reardon,* 204 U. S. 152, 160; *Keeney* v. *New York,* 222 U. S. 525, 536; *Hendrick* v. *Maryland,* 235 U. S. 610, 621; *Oliver Iron Co.* v. *Lord,* 262 U. S. 172, 180. But the result will not be changed if their standing be assumed. The law has regard in these matters, not to invariable sequences, but to probabilities and tendencies. " The problems of government are practical ones and may justify, if they do not require,

rough accommodations—illogical, it may be, and unscientific." *Metropolis Theatre Co.* v. *Chicago,* 228 U. S. 61, 69. "The fact that a better taxing system might be conceived does not render the law invalid." *Salomon* v. *State Tax Comm'n,* 278 U. S. 484, 491. At the very least, an increase of gross sales carries with it an increase of opportunity for profit, which supplies a rational basis for division into classes, at all events when coupled with evidence of a high degree of probability that the opportunity will be fruitful.

Many a pertinent analogy reinforces this conclusion. The tax upon a long chain of stores is often at a higher rate than the tax upon a short one (*State Board of Tax Commissioners* v. *Jackson, supra*), yet it may happen that in lean years, still more in financial crises, the greater the number of stores, the less the actual gain. *Fox* v. *Standard Oil Co., ante,* p. 87. The presence of such a possibility does not make the graduation wrongful. The theatre charging a high price for tickets of admission may be taxed at a higher rate than one whose admission price is low. A showing that the revenue of the high priced theatres is less than that of some of the others will not cause the tax to fail. *Metropolis Theatre Co.* v. *Chicago, supra.* McKenna, J., sagely pointed out in that case that the choice between high and low prices had been made by the theatre itself and made in response to its own conception of advantage. A conception good enough for the taxpayer was thought to be good enough for the government. So here, under the challenged statute. Larger and larger sales are sought for by business and sought for with avidity. They are not the products of whim and fancy. They represent a conception of probabilities and tendencies confirmed by long experience. The conception is no more arbitrary in the brain of a government official than it is in the mind of a company director.

The striving to expand being so general, there is no occasion for surprise at the discovery of a relation between profit and expansion when expansion is kept within the bounds of moderation. In tracing that connection it will not do to compare the profits of one line of business with those of a different one viewed in isolation. Many factors enter to make one kind of enterprise more gainful than another. Cf. Tolman, *op. cit., supra,* at p. 112. Moreover, the rule is undoubted that different occupations may be taxed in different ways. *Bell's Gap R. Co.* v. *Pennsylvania,* 134 U. S. 232, 237; *Stebbins* v. *Riley,* 268 U. S. 137, 142; *Ohio Oil Co.* v. *Conway,* 281 U. S. 146, 159; *Union Bank* v. *Phelps,* 288 U. S. 181. Comparison must be between large and small enterprises in the same line of business, or in many lines of business viewed in combination. This comparison being made, large sales will be found in the main to have the advantage over small ones. There are those who hold that growth may be so large as to make the business clumsy and inefficient, destroying unity of management, but enterprises swollen to that extent are not the common run that fix the patterns of a statute. It is significant that graduation stops according to the plan of the Kentucky statute before size becomes inordinate.

In what has been written the effort has been to show that enhancement of the gross sales has a tendency in respect of the average business enterprise to increase capacity to pay by making the gains larger than they would be if sales were small. This, if it has been made out, will serve without more to sustain the separation into classes that is now under attack. *Magoun* v. *Illinois Trust & Savings Bank,* 170 U. S. 283, 293, 296; *Knowlton* v. *Moore,* 178 U. S. 41, 54. But statistics are not lacking to give color to a broader claim. The studies of the Harvard Bureau of Business Research show (Bulletins 74, 78, 83 and 85) that despite occasional aberrations gross sales have

574

a direct bearing on the ratio of net gain to sales and on the ratio of net gain to net worth.[2] In brief there is not only an increment of profit expressed in terms of dollars, but an increment also when the profit is expressed as a percentage. How far the teachings of these tables are to be credited as accurate, it is not for us to say. *Williams v. Mayor*, 289 U. S. 36, 42; *O'Gorman & Young v. Hartford Fire Insurance Co.*, 282 U. S. 251, 257. They are confirmed by economists of standing who testified for the state. Opposed are other scholars, also men of high repute, who have studied the results of large scale enterprises and small ones, and on the basis of that study advance a different doctrine. They find that the high percentages of profit are more likely to be earned when capital

---

[2] Bulletin 74 deals with the operations of department stores for 1927. One set of tables includes stores whose sales are in excess of a million dollars. They are divided into four classes (one million to two million; two million to four million; four million to ten million; ten million and over). Referring to these classes, the report says (p. 10): "While noticeable differences appeared in net profit for stores grouped according to volume of sales, these differences were even greater in the case of total net gain both as a percentage of net sales and as a percentage of net worth. In each instance these figures varied directly with the volume of sales, and a distinctly more favorable showing was made by the larger firms." Another set of tables includes stores whose sales were under a million dollars. Among these the most favorable net profit showing was that of the group with volume of sales between one quarter and one half million. Between half a million and a million, the ratio of increase declined. Even there, however, the showing was more favorable than for stores under a quarter of a million, where the average was one of loss. Bulletins 78, 83 and 85 state the operations for later years with results not greatly different. Even in years of loss, the percentage of loss had in the main a tendency to be lower as the volume of the sales increased. "It is quite clear that the larger stores operated on a distinctly more satisfactory basis than the smaller stores, and that success as measured by earnings varies directly with size." Bulletin 85, p. 8.

and sales are moderate. Epstein, Industrial Profits in the United States, pp. 45, 46, 131, 132. On the other hand, they are not hostile to the doctrine that on the average the net earnings of a business increase absolutely, though not proportionately, as the sales increase in volume.[3] Even as to percentages, the lawmakers of Kentucky were at liberty to reach their own conclusion in the face of these conflicting judgments pronounced by men of learning. If their conclusion is not arbitrary, it is not for us to set them right.

The studies back of these statistics are instructive not merely as to results but also as to causes. Harvard Bureau of Business Research, Bulletin 85, p. 9. Sales on a large scale are accompanied, it seems, by differences of method as well as differences of quantity. Some of the attendant advantages are matters of common knowledge. The big shops having ample capital can get the best locations. This is a form of advertising, productive of good will. The big shops can practise economies impossible for small ones. In particular they can make their purchases in bulk and hence at cheaper prices. The big shops acquire a prestige that makes customers eager to buy of them. Here and there they can even charge a little more than others, at least for high priced goods, or goods not wholly standardized, and the buyer will ignore the difference. If they happen to be department stores, they stimulate a customer to buy at one shop without the bother of going elsewhere. If they happen to be chain stores, they have other methods of attraction. Even management tends to be more efficient unless the business becomes unwieldy by reason of its size. Bulletin 85, *supra.* The president of the Kroger Company tells us: " Kroger trains

---

[3] The prevailing opinion in effect concedes " that averaging the results of the concerns making the reports it is true ' generally speaking,' as the court below put it, that profits increase with sales."

its men, having regular training schools and diplomas." As already pointed out, the scheme of the Kentucky statute puts a stop to graduation before size becomes immoderate. From all this it comes about that many avenues of profit closed to the little dealer are open to his big competitor.

The framers of a system of taxation may properly give heed to convenience of administration, and in the search for that good may content themselves with rough and ready compromises. Elaborate machinery, designed to bring about a perfect equilibrium between benefit and burden, may at times defeat its aim through its own elaboration. A crippling result of the decision just announced will be to restrict the choice of means within bounds unreasonably narrow. Hereafter in the taxation of business a legislature will be confined, it seems, to an income or profit tax if it wishes to establish a graduated system proportioning burden to capacity. But profits themselves are not susceptible of ascertainment with certainty and precision except as the result of inquiries too minute to be practicable. The returns of the taxpayer call for an exercise of judgment as well as for a transcript of the figures on his books. They are subject to possible inaccuracies, almost without number. Salaries of superintendence, figuring as expenses, may have been swollen inordinately; appraisals of plant, of merchandise, of patents, of what not, may be erroneous or even fraudulent. In the words of a student of the problem, " statements of profits are affected both by accounting methods and by the optimistic or pessimistic light in which the future is viewed at the time when the accounts are made up." Epstein, *op. cit., supra,* p. 5. These difficulties and dangers bear witness to the misfortune of forcing methods of taxation within a Procrustean formula. If the state discerns in business operations uniformities and averages that seem to point the way to a system easier to administer than one based upon a report

of profits, and yet likely in the long run to work out approximate equality, it ought not to be denied the power to frame its laws accordingly.

For answer to all this the thrust will not avail that " it is difficult to be just and easy to be arbitrary." The derogatory epithet assumes the point to be decided. There is nothing arbitrary in rescuing a vast body of taxpayers from the labor and expense of preparing elaborate reports, at best approximately accurate. There is nothing arbitrary in rescuing a government from the labor and expense of setting up the huge and unwieldly machinery of an income tax department with a swarm of investigators and accountants and legal and financial experts. To frame a system of taxation in avoidance of evils such as these is no act of sheer oppression, no abandonment of reason, no exercise of the general will in a perverse or vengeful spirit. Far from being these or any of them, it is a pursuit of legitimate ends by methods honestly conceived and rationally chosen. More will not be asked by those who have learned from experience and history that government is at best a makeshift, that the attainment of one good may involve the sacrifice of others, and that compromise will be inevitable until the coming of Utopia.

The argument is made that the principle of graduation, once it has gained a lodgment, may be extended indefinitely, with the result that in some other statute the rate for the upper levels, instead of being confined as it is here to something less than one per cent, may be ten per cent or twenty, thus wiping out profits when business is done on a large scale. A sufficient answer may well be that no such act is now before us; but if this answer be inadequate, another is at hand. The more effective answer is that under the law of Kentucky the danger is illusory. There is no need to consider in respect of an excise upon sales whether the doctrine of *Magnano Co.* v. *Hamilton,* 292 U. S. 40, and *Fox* v. *Standard Oil Co., supra,* could be

invoked successfully to uphold a destructive measure of taxation if the standard of validity were to be looked for in the Fourteenth Amendment and not in any other law. The significance of whatever distinctions there may be will be weighed when the event arises. For the present it is enough to say that, under the constitution of Kentucky as interpreted by repeated decisions of her highest court, no tax law in the nature of an excise will be upheld if its effect is so drastic as to extinguish profits altogether. *Fiscal Court of Owen County* v. *Cox Co.,* 132 Ky. 738; 117 S. W. 296; *Louisville* v. *Pooley,* 136 Ky. 286; 124 S. W. 315; *Sperry & Hutchinson* v. *Owensboro,* 151 Ky. 389; 151 S. W. 932. Because of those decisions we refused only recently to sustain a statute of Kentucky imposing a prohibitory tax upon the sale of oleomargarine (*Glenn* v. *Field Packing Co.,* 290 U. S. 177, affirming 5 F. Supp. 4), though in *Magnano Co.* v. *Hamilton, supra,* a like tax, adopted by the state of Washington, was held to be consistent with the constitution of the nation. The relevant provisions of the Kentucky constitution and of the explanatory judgments of her courts are written by implication into the Kentucky tax act as if put there in so many words. The act is to be interpreted as if it said: " The tax hereby imposed is not to be collected if the result will be to wipe out the profits of a business conducted with ordinary efficiency, or to reduce the profits to a level unreasonably low." Such an extinguishment of profits is not the outcome of the tax when the act is applied to the business of these petitioners, and so the court below has found.[4] Such can never be the outcome either under this

---

[4] A loss of $9,023 would have been suffered by one of the petitioners if the tax had been paid in 1932, but the finding is that for that year the business was conducted without reasonable skill, and that with a change of the methods of management the loss was turned into a profit. At most the operations of that year might call under the Kentucky decisions for a modification of the judgment. The petitioners seek an injunction that will annul the statute altogether.

act or any other as long as the constitution of Kentucky continues what it is today.

The case has thus far been considered almost wholly without reference to the precedents. When these are examined, the conclusion is even clearer. To dwell upon the chain store decisions is needless. *Board of Tax Commissioners* v. *Jackson, supra; Fox* v. *Standard Oil Co., supra; Liggett Co.* v. *Lee,* 288 U. S. 517. They are too recent to be forgotten. Classification in those cases ran athwart the lines of profit, yet it was none the less sustained. There is no magic, however, in the catchword of a " chain." In cases not so recent, other forms of business enterprise have been subjected to graduated taxes on the basis of size alone without reference to profits. Thus, in *Clark* v. *Titusville,* 184 U. S. 329, a license tax was laid upon wholesale and retail merchants, the rate for each class varying progressively with the amount of the gross sales. The court upheld the classification as one reasonably related to capacity to pay. In *Metropolis Theatre Co.* v. *Chicago, supra,* already summarized in this opinion, a tax upon theatres proportioned to the cost of tickets was upheld against the contention of the taxpayer that the price of tickets was unrelated to the profits of the venture. In *Pacific American Fisheries* v. *Alaska,* 269 U. S. 269, a tax had been laid on salmon canneries at graduated levels, the percentage of the tax increasing with the number of cases packed. It was pressed that the tax discriminated against large canneries in favor of small ones. The argument was dismissed with the remark that " classification of taxes by the amount of the corpus taxed has been sustained in various connections heretofore." Cf. *Maine* v. *Grand Trunk Ry. Co.,* 142 U. S. 217, 228; *Dow* v. *Beidelman,* 125 U. S. 680, 691; *Chicago, Burlington & Quincy R. Co.* v. *Iowa,* 94 U. S. 155, 164; *Chesapeake & Ohio Ry. Co.* v. *Conley,* 230 U. S. 513, 522; *Spreckels Sugar Refining Co.* v. *McClain,* 192 U. S. 397; *Hope Gas Co.* v. *Hall,* 274 U. S. 284; *Citi-*

*zens' Telephone Co.* v. *Fuller*, 229 U. S. 322; *Heisler* v. *Thomas Colliery Co.*, 260 U. S. 245; *Brown-Forman Co.* v. *Kentucky*, 217 U. S. 563; *Postal Telegraph Cable Co.* v. *Adams*, 155 U. S. 688. See also *Louisville Gas Co.* v. *Coleman*, 277 U. S. 32, 43, 44, which brings the precedents together. Other cases could be added.

In fine, there may be classification for the purpose of taxation according to the nature of the business. There may be classification according to size and the power and opportunity of which size is an exponent. Such has been the teaching of the lawbooks, at least until today.

I am authorized to state that MR. JUSTICE BRANDEIS and MR. JUSTICE STONE join in this opinion.