3 So.2d 572

### KING & BOOZER v. STATE (UNITED STATES, Intervener).

3 Div. 351.

Supreme Court of Alabama.

July 29, 1941.

Writ of Certiorari Granted Oct. 13, 1941.
See 62 S.Ct. 118, 86 L.Ed. ——.

Knox, Liles, Jones & Blackmon, of Anniston, for appellant King & Boozer.

560

Thos. S. Lawson, Atty. Gen., and John W. Lapsley and J. Edw. Thornton, Asst. Attys. Gen., for the State.

LIVINGSTON, Justice.

This is an appeal from a decree of the Circuit Court of Montgomery County, in equity, confirming an assessment made by the State Department of Revenue on May 15, 1941, against King and Boozer, a partnership composed of Tom Cobb King and Simon Elbert Boozer, for sales taxes for the period beginning January 1, 1941, and ending March 31, 1941, in the sum of $1,-236.71 tax and $123.67 penalty thereon. The decree of the circuit court was entered on June 13, 1941, and the appeal therefrom to this Court was duly perfected on June 16, 1941.

· The tax here involved was assessed under the provisions of the Alabama Sales Tax Act, General Acts 1939, page 16, Code 1940, Tit. 51, §§ 752–783, 785, 786, 831, on the gross proceeds of sales of tangible personal property, consisting of lumber purchased from King and Boozer in connection with the performance of a contract entered into by Dunn Construction Company, a corporation, and John S. Hodgson and Company, a partnership, jointly performing

the contract, and hereinafter called the contractor, with the United States of America, hereinafter called the Government, on September 9, 1940, for the construction of a complete tent camp, including necessary buildings, temporary structures, utilities and appurtenances thereto at Fort McClellan, Alabama.

The facts necessary for the decision are, in addition to the above, substantially as follows:

The contract between the Government and the contractor is designated as a cost-plus fixed-fee construction contract. It states that the estimated total cost of construction work to be in the approximate amount of $3,204,588, exclusive of the contractor's fee, subject to the express understanding that the contractor does not guarantee the correctness of the estimate, which is recited to be based upon a detail estimate agreed upon by both the Government and the contractor. The contract states that a fixed fee of $128,865 is to be paid to the contractor, which shall constitute complete compensation for the contractor's services including profit and all general overhead expenses.

The contract provides that the contractor shall furnish all labor, materials, tools, machinery, equipment, facilities and supplies not furnished by the Government, and shall do all things necessary for the completion of the work in accordance with the drawings, specifications and instructions contained in the contract, or to be furnished by the contracting officer, the officer who executed the contract on the part of the Government and who was in charge of the construction work, by or through his authorized representative.

The contract further provides that in addition to the payment of the contractor's fixed fee, the contractor shall be reimbursed for such of his actual expenditures in the performance of the work as may be approved and ratified by the contracting officer, and for payment of rental to the contractor for the construction plant or parts thereof or tools or equipment as the contractor may furnish or rent from others, not to exceed the rates approved by the contracting officer.

The orders for materials and supplies were placed by the contractor, but the Government reserved the right to furnish any materials, construction, equipment, machinery, or tools necessary for the completion of the work, and to pay directly to the persons concerned all sums due from the contractor for labor, materials, freight charges and other charges.

With respect to the payment of costs, the contract provides that the Government will currently reimburse the contractor upon certification to and verification by the contracting officer of the original papers governing pay rolls for labor, invoices for materials, and other expenditures. Generally, reimbursements are to be made weekly, but may be made more frequently if conditions warrant.

The contract further provides that title to all work, completed or in the course of construction, shall be in the Government. Likewise, upon delivery at the site of the work, or at an approved storage site, and upon inspection and acceptance in writing by the contracting officer, title to all materials, tools, machinery, equipment and supplies, for which the contractor shall be entitled to reimbursement, is to vest in the Government. These provisions as to title being vested in the Government shall not operate to relieve the contractor from any duties imposed under the terms of the contract.

It is further provided by the contract that the contracting officer is authorized at any time to make changes in or additions to the drawings and specifications, to issue additional instructions, require additional work or to direct the omission of work covered by the contract. If such changes cause a material increase or decrease in the amount or character of the work, or in time required for its performance, an equitable adjustment of the amount of the fixed fee to be paid to the contractor shall be made, and the contract shall be modified in writing accordingly. It is also required by the contract that, unless the contracting officer shall waive in writing the requirement, the contractor shall reduce to writing every contract in excess of $2,000 made by him for the purpose of the work for services, materials, supplies, machinery, or equipment: insert therein a provision that such contract is assignable to the Government: make all contracts in his own name, and not bind or purport to bind the Government or the contracting officer; and make or place no purchases in excess of $500 without the prior approval of the contracting officer.

That the contractor shall keep records and books of account, showing actual cost to him of all items of labor, materials,

equipment, supplies, services and other expenditures of whatever nature for which reimbursement is authorized under the provisions of the contract, and that the contracting officer shall at all times be afforded proper facilities for inspection of the work, and shall at all times have access to the premises, work, materials, books, records, correspondence, instructions, plans, drawings, receipts, vouchers, and memoranda of every description of the contractor pertaining to the work.

The contract further provides that the contractor shall be reimbursed for payments made by the contractor from his own funds under the Social Security Act, and any applicable state or local taxes, fees, or charges which the contractor may be required on account of the contract to pay on or for any plant, equipment, process, materials, supplies or personnel; and, subject to advance approval by the contracting officer, permit and license fees, and royalties on patents used, including those owned by the contractor.

Under the terms of the contract the contractor shall take advantage of all such benefits as cash and trades discounts, rebates, allowances, credits, salvage, commissions, etc., and that in determining the actual net cost of articles and materials, such benefits shall be deducted from the gross cost thereof.

The record contains in substance the following stipulation of facts: Prior to January 1, 1941, a proposal was submitted by King and Boozer in writing to the contractor to sell large quantities of prefabricated lumber at a stipulated price for use in the performance by the contractor of his contract with the Government of September 9, 1940. This proposal was submitted by the contractor to the constructing quartermaster, the authorized representative of the contracting officer at Fort McClellan for his approval and was approved by him. It was stipulated and agreed that all of the sales by King and Boozer of tangible personal property which are involved herein were made in connection with the performance by the contractor of his contract of September 9, 1940, and that the property was sold, paid for, and reimbursement made therefor in the manner stated hereinafter with respect to a particular purchase made on January 17, 1941.

Pursuant to the proposal submitted by King and Boozer, the contractor, on January 16, 1941, prepared and submitted to the constructing quartermaster a request for the purchase of certain lumber, and requested the approval by the constructing quartermaster of the purchase. The approval of the constructing quartermaster was endorsed on the request for purchase. Thereafter, on January 17, 1941, the contractor submitted to King and Boozer at Anniston, Alabama, an order for the lumber. As shown by a copy of the order, it was signed by the purchasing agent of the contractor and directed that the materials described in the order should be shipped to the United States Construction Quartermaster at Fort McClellan, Alabama, for account of Dunn Construction Company, Inc., and John S. Hodgson and Company, f. o. b., Fort McClellan. The order further provided as follows:

"This order is placed for the benefit of, and is assignable to, the United States Government.

"This purchase order does not bind, nor purport to bind, the United States Government or Government officers thereunder.

"Terms of Payment as stated on obverse side of this purchase order are understood to be effective upon arrival at destination and acceptance of material by properly accredited U. S. Government officers or representatives having jurisdiction over same, and of properly executed bills of lading (or shipping papers) and receipt of certified invoice."

The purchase order further provided that bills of lading, etc., must read "United States Constructing Quartermaster at Fort McClellan, Alabama. Account of Dunn Construction Company, Inc., and John S. Hodgson and Company."

The purchase order also provided that copies of the invoice should be properly filled out and certified as follows:

"I certify that the above bill is correct and just; that payment therefor has not been received; and that except as noted below or otherwise indicated herein all unmanufactured articles, materials, or supplies furnished under this invoice have been mined or produced in the United States and all manufactured articles, materials or supplies have been manufactured in the United States substantially all from articles, materials, or supplies mined, produced or manufactured, as the case may be, in the United States; and that state or local sales taxes are not included in the amounts billed."

Upon receipt of the purchase order, King and Boozer loaded at its plant or principal place of business at Anniston, Alabama, the material ordered upon trucks operated by a contract carrier engaged by it for the purpose of transporting the lumber from its place of business at Anniston to a designated point within Fort McClellan. At the time King and Boozer loaded the lumber upon the trucks of the contract carrier, the materials were checked and inspected and two reports were made. One report was required to be made by the constructing quartermaster and was signed by an employee of the contractor and by an employee of the United States representing the constructing quartermaster. The other report was a report made to the contractor, and was signed by an employee of the contractor and by an employee of the United States representing the constructing quartermaster.

On January 18, 1941, King and Boozer delivered to the contractor an original invoice on account of the purchase of the materials described in the purchase order of January 17, 1941. On January 21, 1941, this invoice, along with others not involved in this case, was transmitted to the constructing quartermaster at Fort McClellan, Alabama, for his approval for payment by the contractor of the invoice. On January 29, 1941, the constructing quartermaster approved the invoice for payment. Thereafter, but prior to February 3, 1941, the contractor issued his check to King and Boozer in full payment of the invoice mentioned above, in the amount of $68.23, being the amount of $68.40 less one-fourth of one percent. discount, which check upon presentation was paid in due course.

Thereafter, on February 3, 1941, the contractor submitted a voucher to the United States War Department, through the constructing quartermaster at Fort McClellan for reimbursement for expenditures by it aggregating $1,991.62, including its expenditure of $68.23 made to King and Boozer as stated above. This voucher did not include any amount for Alabama sales taxes, no such tax having been paid by the contractor or by King and Boozer.

The field auditor of the constructing quartermaster and the constructing quartermaster approved the voucher for payment, and on February 5, 1941, the voucher was paid by the finance officer at Fort McClellan to the contractor by the United States Government's check.

In submitting for payment the voucher mentioned above, the contractor attached thereto its request made to the constructing quartermaster for approval of the purchase, bearing approval of the constructing quartermaster for the purchase, copies of its purchase order to King and Boozer, the two receiving and inspection reports, and the invoice of King and Boozer.

It was further stipulated that in the performance of the contract between the contractor and the Government, in some instances not involved in the assessment hereinabove mentioned, competitive bids for the material required for the performance of the contract were called for by the quartermaster general of the United States with respect to various materials to be used in such performance, and that after the acceptance of one of the bids received in response to the call, the quartermaster general informed the constructing quartermaster and the contractor of such acceptance and requested or directed the contractor to purchase the materials from the competitive bidder for and in connection with the performance of the contractor's contract with the United States, which purchase was thereafter handled in the same manner as if the bid had been originally submitted to the contractor, and the materials were paid for by the contractor and bills for reimbursement were thereafter submitted, approved, and paid to the contractor in the same manner as in the case of the typical transaction hereinabove mentioned and described in detail.

It was further stipulated that Fort McClellan is located upon and constitutes an area situated in Calhoun County in the State of Alabama, acquired by the United States of America in 1918 by purchase from the individual owners of such land; that since such acquisition thereof the United States has continuously used the area as a military reservation or fort; and that all of the buildings and improvements mentioned in the contract of September 9, 1940, were constructed or required to be constructed upon the area known as Fort McClellan.

It was stipulated and agreed that the constructing quartermaster at Fort McClellan was a representative at Fort McClellan of the contracting officer, C. D. Hartman, Brigadier General, Quartermaster Corps, United States Army, and that the constructing quartermaster was duly authorized to act for and on behalf of the

United States and the contracting officer in all matters pertaining to the contract of September 9, 1940, between the United States and Dunn Construction Company, Inc., and John S. Hodgson and Company.

There was the further stipulation that King and Boozer had billed Dunn Construction Company, Inc., and John S. Hodgson and Company for the taxes, or for a sum equal to the amount of the taxes, assessed against King and Boozer which are involved in the present case, but which have not been paid.

The questions presented for decision are:

(1) Whether the purchases involved herein were made by or on behalf of the United States or by an agency or instrumentality of the United States, and, if so, whether such purchases are constitutionally immune from taxation by the State of Alabama under Act No. 18 of General Acts of Alabama of 1939 (page 16).

(2) Whether the United States, in the construction contract here involved, consented to the imposition of sales taxes by the State of Alabama.

(3) Whether the State of Alabama possessed the territorial jurisdiction to impose the taxes here involved, dependent (a) upon whether the sales in controversy were consummated upon the area known as Fort McClellan, and (b) upon whether the Congress in Public No. 819, 76th Congress, approved October 9, 1940, 4 U.S.C.A. §§ 12–18, expressly released and waived exclusive jurisdiction over Camp McClellan insofar as the transactions here in controversy are concerned.

(4) Whether the sales in controversy are exempted from tax by section V of Act No. 18 of the General Acts of Alabama of 1939 (page 16, Code 1940, Tit. 51, § 755).

The contract between the Government and the contractor was authorized by an Act of Congress, providing for the national security and the acquisition of facilities and weapons of defense. Public 703, 76th Congress, approved July 2, 1940, 54 Stat. 712.

The General Act No. 18, General Acts of Alabama of 1939, (page 16) provides:

"Section II. There is hereby levied, in addition to all other taxes of every kind now imposed by law, and shall be collected as herein provided, a privilege or license tax against the person on account of the business activities and in the amount to be determined by the application of rates against gross sales, or gross receipts, as the case may be, as follows: (a). Upon every person, firm or corporation engaged, or continuing within this State, in business of selling at retail any tangible personal property whatsoever, including merchandise and commodities of every kind and character (not including, however, bonds or other evidences of debt or stocks), an amount equal to two per cent (2%) of the gross proceeds of sales of the business except where a different amount is expressly provided herein. * * *

"Section V. Exemptions: There are however exempted from the provisions of this act and from the computation of the amount of the tax levied, assessed or payable under this Act the following: (a). The gross proceeds of sales of tangible personal property or the gross receipts of any business which the State is prohibited from taxing under the constitution or laws of the United States of America or under the constitution of this state."

■ The nature of the tax is not determined by the name given to it, or by the use of some particular form of words, but by the substance and realistic impact of the tax; and while the tax here involved is denominated in section II as a privilege or license tax upon every person engaged in the business of selling tangible personal property at retail, determined by a stated percentage of gross proceeds of sales, section XXVI makes it unlawful for any person to fail or refuse to add to the sales price and collect from the purchaser the amount due on the tax. The ultimate burden of the tax is thus passed on to the consumer, and in truth and in fact the tax can well be denominated a consumers' tax. Lone Star Cement Corp. v. State Tax Commission, 234 Ala. 465, 175 So. 399; Long v. Roberts & Son, 234 Ala. 570, 176 So. 213; National Linen Service Corp. v. State Tax Commission, 237 Ala. 360, 186 So. 478; McPhillips Mfg. Co. v. Curry, Ala. Sup., 2 So.2d 600.[1] See, also, Macallen Co. v. Massachusetts, 279 U.S. 620, 49 S.Ct. 432, 73 L.Ed. 874, 65 A.L.R. 866; New Jersey Bell Tel. Co. v. State Board, 280 U.S. 338, 50 S.Ct. 111, 74 L.Ed. 463; Educational Films Corp. v. Ward, 282 U.S. 379–387, 51 S.Ct. 170, 75 L.Ed. 400, 71 A.L.R. 1226;

---

[1] Ante, p. 366.

Lawrence v. State Tax Commission, 286 U.S. 276, 52 S.Ct. 556, 76 L.Ed. 1102, 87 A.L.R. 374; Stewart Dry Goods Co. v. Lewis, 294 U.S. 550, 55 S.Ct. 525, 79 L.Ed. 1054; Wisconsin v. J. C. Penney Co., 311 U.S. 435, 61 S.Ct. 246, 85 L.Ed. 267.

■ There is no doubt but that a sale of material to the Government to be used in promoting its governmental enterprises cannot be made the basis of a state sales tax. Panhandle Oil Co. v. Mississippi ex rel. Knox, 277 U.S. 218, 48 S.Ct. 451, 72 L. Ed. 857, 56 A.L.R. 583; Graves v. Texas Co., 298 U.S. 393, 56 S.Ct. 818, 80 L.Ed. 1236.

■ In the Panhandle Oil Company case, supra, it is said that the State "may not lay any tax upon the transactions by which the United States secures the things desired for its governmental purposes." As to the case of Graves v. Texas Company, supra, this Court had held that the gasoline tax then in existence laid on a "storer" was due and payable when it was withdrawn from storage, and was measured by the amount so withdrawn. State v. City of Montgomery, 228 Ala. 93, 151 So. 856. In the Graves case, supra, the minority of the United States Supreme Court held that the tax event had fully matured when there was a withdrawal from storage, and was then due and payable by the storer, though it was sold to the United States for governmental purposes and could be passed on to the Government in the sale. But the majority of that court held that such a tax on storing and withdrawing is upon something essential to a sale to the United States and is as objectionable as it would be on the sale itself to the United States. This is of course upon the settled principle that neither the United States nor its instrumentalities which are engaged in carrying on its powers can be taxed by a state so as to burden the Government directly or immediately.

■ It is true that sometimes a taxable event occurs of a local sort which has close and intimate relations to interstate commerce and on which a state may levy. But this is on the theory that interstate commerce must "pay its way," so that local transactions in close relation to such commerce may be locally taxed without discrimination, if such an event is not subject to a local tax in some other sovereignty. The prohibition of a state to tax interstate commerce is considered to exist only when such taxation interferes with

that commerce, and should not be extended beyond the necessity of keeping interstate commerce free from interference. Coverdale v. Arkansas-Louisiana Pipe Line Co., 303 U.S. 604, 58 S.Ct. 736, 82 L.Ed. 1043; Southern Pac. Co. v. Gallagher, 306 U.S. 167, 59 S.Ct. 389, 83 L.Ed. 586; Western Live Stock v. Bureau of Revenue, 303 U. S. 250, 58 S.Ct. 546, 82 L.Ed. 823, 115 A. L.R. 944.

■ But the United States is not under the principle of "paying its way" in respect to taxation. And while there may be a local taxable event in the continuous flow of commerce between the states, there cannot be a distinct taxable event in the continuous flow of circumstances by which the Government acquires the thing desired for its purposes. The imaginary contemplation of such event applicable to interstate commerce does not exist, because such commerce may be burdened so long as it is not interfered with, whereas no burden can be directly laid upon the activities of the Government. But this does not prohibit the levy by a state of nondiscriminatory taxes on the machinery, equipment and gasoline used by an independent contractor in the performance of his contract with the Government. Trinity Farm Construction Co. v. Grosjean, 291 U.S. 466, 54 S.Ct. 469, 78 L.Ed. 918.

■ It is said that there is no exact formula applicable to all cases where an instrumentality is used by the Government, by which to determine whether it is immune from taxation on this principle. But if it is of such character as to be intimately connected with the exercise of a power or the performance of a duty by the Government, any taxation of it by a state which would be a direct interference with the functions of the Government would be plainly beyond the taxing power. Metcalf & Eddy v. Mitchell, 269 U.S. 514, 46 S.Ct. 172, 70 L.Ed. 384.

■ This does not inhibit the laying of a tax by a state on the income of an agent, officer, employee or other instrumentality of the Government, which he may derive from such employment, and which has come into his personal ownership free from Government control in connection with such agency. Graves v. New York ex rel. O'Keefe, 306 U.S. 466, 59 S.Ct. 595, 83 L.Ed. 927, 929, 120 A.L.R. 1466; Western Ry. Co. v. State, ante, p. 440, 3 So.2d 9.

And the fact that in his or its relations with the Government, the burden of the anticipated tax may be passed on economically to the Government through its effect on the price level of labor and material, is but a normal incident of the situation. Graves v. New York ex rel. O'Keefe, supra.

But when the incidence of the tax, as such, falls directly upon the Government to the extent that it is required to pay a tax in that form to the State, arising from the nature of its contract, the situation is different from one in which such tax is hidden in the price levels, and loses itself as a tax as where it is but a part of the overhead and other factors which enter into the fixation of such prices.

The contractor here was acting for the Government in the accomplishment of a governmental purpose. His acts were all under the immediate and direct supervision of the governmental authorities. His contract partakes of the nature in some respects of an independent contractor, and in some of an agency of the Government. It is not necessary here to define the exact status in respect to all his dealings, whether an independent contractor or an agency under employment of the United States. The question here is whether a sales tax is in essence laid on a transaction by which the United States secures the things desired for governmental purposes. The title to the material went immediately into the United States and this was accomplished in a single transaction. The contractor did not buy nor sell, as a dealer, on his own account. 12 Corpus Juris Secundum, Brokers, p. 8, § 2.

The transactions of a broker may by contract be such as that the title of the property will or will not pass through him (though usually it does not), and he may by contract collect from the consumer; but he does not deal on his own account. 12 Corpus Juris Secundum, Brokers, p. 74, § 29; 9 Amer.Jur. 1013, section 54, page 1014, section 56. The incident in his relations most important in determining his status is whether he is dealing for himself or for another. 12 Corpus Juris Secundum, Brokers, p. 8, § 2. An independent building contractor is usually dealing on his own account, and the materials and supplies remain in his ownership until they are affixed to the land. But by agreement the material may become the property of the owner before they are affixed to the land. 17 Corpus Juris Secundum, Contracts, pp. 1110, 1111, § 516; 9 Corpus Juris p. 732, § 71.

So that whether this contractor as to the materials, occupies a status similar to that of a broker, or of an independent contractor, is not controlled by the circumstances that he pays for it in the first place, or that the title immediately passes to the Government without any stoppage in him for any purpose.

Under the contract here involved, the Government was to, and did, acquire the title to the things desired for its governmental purposes. The contractor took for the Government an essential step in the transaction by which such title was acquired. The contractor was not acting for himself in doing so, though he was in name the purchaser, and though indebted for the agreed price. He had no power of disposition of the property, but to use it on this project. He did not use it as his own property, but as the property of the Government, which was to pay him the exact amount of its purchase price which he paid, or was obligated to pay. He could not make a charge for it of an amount in excess of its cost to him. His only interest in the material was that its quality and amount (perhaps its price, if over $500) was to be satisfactory to the Government.

Article II(m) of the contract here involved, dealing with the reimbursement of the contractor for his expenditures, provides as follows: "Payments made by the contractor from his own funds under the Social Security Act, and any applicable state or local taxes, fees, or charges which the contractor may be required on account of this contract to pay on or for any plant, equipment, process, materials, supplies, or personnel; and, subject to advance approval by the contracting officer, permit and license fees, and royalties on patents used, including those owned by the contractor."

The State of Alabama contends that by this provision of the contract, the Government consented to the imposition of the tax which is involved in this case. This provision of the contract relates only to the reimbursement of the contractor for applicable State taxes which the contractor may be required to pay. It does not deal with the waiver of any immunity of the Government; and there is no indication of a purpose to acquiesce in the levying of improper or invalid taxes.

568

The contracting officer could not waive the immunity. The Supreme Court of the United States in the recent case of Royal Indemnity Co. v. United States, 61 S.Ct. 995, 997, 85 L.Ed. 1361, speaking through Mr. Justice Stone, now Chief Justice, said: "Power to release or otherwise dispose of the rights and property of the United States is lodged in the Congress by the Constitution. Art. IV, § 3, Cl. 2. Subordinate officers of the United States are without that power, save only as it has been conferred upon them by Act of Congress or is to be implied from other powers so granted."

The further argument is, that bill H.R. 8438, relating to appropriations for the Navy Department for the fiscal year 1941 contained a provision authorizing the use of the cost-plus fixed-fee contracts. To the bill, the Senate added an amendment, No. 120, providing that all contractors who enter into cost-plus fixed-fee contracts shall, in the discretion of the Secretary of the Navy, be held to be agents of the United States for the purposes of such contracts, and that all purchases under such contracts shall be exempt from federal, state and local taxes. The amendment was defeated in the House (Cong.Record, Vol. 86, part 7, pp. 7532–35), and the Senate concurred (Cong.Record, Vol. 86, part 7, p. 7648).

The Acts of Congress under which the contract here involved was amended, were enacted on June 13, 1940, 54 Stat. 350, and July 2, 1940, subsequent to the defeat of Senate amendment No. 120 to the Navy Appropriations Bill, and the State contends that Congress was aware of the tax reimbursement provisions in the cost-plus fixed-fee contract at the time of the adoption of these acts, and in expressly authorizing such form of contract, including such provision, Congress approved the tax clause therein and intended to permit the contractor to pay State taxes. In other words, such action by the Congress waived the tax immunity of the Government and its instrumentalities.

The Congress has the power to waive the immunity from state taxation which would otherwise attach to federal instrumentalities and transactions. But, as was said in the case of Austin v. Boston, 7 Wall. 694, 699, 19 L.Ed. 224, "The waiver must be clear, and every well-grounded doubt upon the subject should be resolved in favor of the exemption." See, also,

Farmers' & Mechanics' Sav. Bank v. Minnesota, 232 U.S. 516, 34 S.Ct. 354, 58 L.Ed. 706.

There can be no doubt but that the immunity exists if the purchases here involved were made by the Government or its agents or instrumentalities. The mere silence of Congress on the question of immunity of cost-plus fixed-fee contracts falls far short of being a waiver of the long established tax immunity of the Federal Government and its instrumentalities.

The conclusion is inescapable that the burden of the tax in the instant case falls directly and immediately upon the Government. The addition of the tax raises the cost of construction which the Government is bound to pay. It in no wise affects the fixed fee of the contractor. This is so irrespective of the agreement to pay applicable taxes.

In view of the foregoing, other questions presented are not here discussed, as they are unnecessary to a decision in this case.

Reversed and rendered.

GARDNER, C. J., THOMAS, BOULDIN, and FOSTER, JJ., concur.

BROWN, J., dissents, being of the opinion the decree of the lower court is correct and should be affirmed.

KNIGHT, J., not sitting.

BROWN, Justice (dissenting).

The material, lumber, in question was sold by the appellants, King and Boozer, to Dunn Construction Company, Inc., and John S. Hodgson and Company, independent contractors under contract with the United States to construct buildings at Camp McClellan, near Anniston, Alabama. The contract between said contractors and the United States provides: "That the contractor *shall furnish* all labor, *material*, tools, machinery, equipment facilities and supplies necessary for the completion of the work." (Italics supplied.)

General Act No. 18, General Acts of Alabama, 1939, page 16, Code 1940, Tit. 51, §§ 752–783, 785, 786, 831, levies the tax, not on the government or its instrumentalities, but on persons engaged in the business of selling, and the tax is merged into the price, as a part thereof. Lone Star Cement Corporation et al. v. State

Tax Commission et al., 234 Ala. 465, 175 So. 399.

While it is true that the purchaser, consumer, ultimately pays the tax, that is true of all taxes which are added in as overhead expense in doing business.

The tax is not levied on the material, the lumber, nor on the title thereof, but on the privilege of selling and if the seller does not include the tax in the price of the sale, he alone is liable. The levy affirmed by the Circuit Court was against, King and Boozer, not against the government.

The mere fact that the material goes into government buildings does not convert the statute into a levy against the United States. The liability for the tax is fixed when the sale is made, and the lumber in the instant case was delivered at the place of intended use to the account of the contractor.

In my opinion the Circuit Court did not err in affirming the levy, and the judgment should be affirmed.

I therefore, respectfully dissent.