**VOLUSIA COUNTY KENNEL CLUB, Inc., et al v.**
**FLORIDA RACING COMMISSION.**

Circuit Court, Leon County.
September 22, 1953.

Robert H. Anderson and D. P. S. Paul of Loftin, Anderson, Scott, McCarthy & Preston, Miami, for plaintiffs.

Richard W. Ervin, Attorney General, George E. Owen, Assistant Attorney General, Fred M. Burns, Assistant Attorney General, John D. Moriarity, Assistant Attorney General, all of Tallahassee, and Walter E. Dence, Miami, for State Racing Commission.

HUGH M. TAYLOR, Circuit Judge.

Plaintiffs, by appropriate pleading, attack the constitutionality of chapter 28,058, Laws of Florida, Acts of 1953, as applied to them. Volusia County Kennel Club, Inc. (hereinafter sometimes referred to as "Volusia") operates a dog racing track near Daytona Beach in Volusia County, and Biscayne Kennel Club, Inc. (hereinafter sometimes referred to as "Biscayne") operates a dog racing track in Dade County—these being two of fourteen such tracks doing business in Florida.

A system of betting is essential to the successful operation of a dog racing track. For many years such betting was prohibited by law in this state. In recent years it has been legalized under very strict laws which—as they existed immediately prior to the enactment of the statute under consideration—may be summarized as follows—

All racing is under the supervision of a State Racing Commission. Permits to establish tracks must be issued by the commission and approved by the voters at an election in the county where the track is to be located. No track can be established within 100 miles of another track. (This provision was enacted after the establishment of Biscayne and certain other tracks which are less than that distance apart.) Betting is permitted "within the enclosure" of any dog racing track when conducted in the form of pari-mutuel pools. Every person entering the track, other than employees of the track and persons actively participating in the care of the animals and operation of the track, is required to acquire a ticket or a pass—upon which a tax is assessed. Pari-mutuel pools are conducted by the track, and from each pool the track is permitted to deduct 17% of the money wagered. The number of days on which races may be run are fixed by law and when there is more than one track in a single county the racing days of each track are set by the Racing Commission. Of the 17% of pari-mutuel pools taken by the track, the track is required to pay to the state a sum equal to 5% of each pari-mutuel pool—provided that any "track having an average daily pari-mutuel pool of less than $20,000 per day for the preceding racing season" shall, in lieu of paying 5% of each pool, be permitted to operate upon paying a fixed daily license fee of $500.

The 1953 Act under attack does not increase the amount which the track may deduct from pari-mutuel pools, it retains the provision permitting those tracks which experienced an average daily play of less than $20,000 during the previous season to pay the state a flat daily fee of $500—this is not under attack—but with respect to all other tracks it requires payments to the state to be made on the basis of the following formula—

### DOG TRACK

| TOTAL PARI-MUTUEL POOL | PARI-MUTUEL POOL TAX |
| --- | --- |
| Do not exceed $50,000 | Five per cent |
| Exceed $50,000 but do not exceed $75,000 | $2,500 plus 8% of excess over $50,000 |
| Exceed $75,000 but do not exceed $100,000 | $4,500 plus 9% of excess over $75,000 |
| Exceed $100,000 but do not exceed $125,000 | $6,750 plus 10% of excess over $100,000 |
| Exceed $125,000 but do not exceed $150,000 | $9,250 plus 11% of excess over $125,000 |
| Exceed $150,000 | $12,000 plus 12% of excess over $150,000 |

The plaintiffs assert that the operation of this statute denies them the equal protection of the law and deprives them of their property without due process of law contrary to the provisions of the constitution of the United States and the constitution of Florida.

The contention that the equal protection clause is violated is based largely on the decision of the United States Supreme Court in Stewart Dry Goods Co. v. Lewis, 55 S. Ct. 525, 294 U. S. 550, 79 L. ed. 1054. That case involved a tax on the gross sales of all retail stores based on a fixed percentage of the amount of sales in each of several brackets specified in the law—the tax being a larger percentage of the gross sales in each higher bracket as the volume of sales increased. Emphasis is laid on the summary of the holding of the court found in the dissenting opinion of Mr. Justice Cardozo, who said—"The prevailing opinion commits the court to a holding that a tax upon gross sales, if laid upon a graduated basis, is always and inevitably a denial of the equal protection of the laws, no matter how slight the gradient or moderate the tax."

If the case at bar presents a situation truly analogous to that passed upon in the Stewart case it is the duty of this court to so determine and to hold the Act here involved to be unconstitutional.

Careful study of the Stewart case reveals that the inherent evil found to exist in the tax there under consideration was that different rates of taxation were imposed with respect to essentially similar *transactions*. The court said—"Although no difference is suggested, so far as concerns the transaction which is the occasion of the tax, between the taxpayer's first sale of the year and his thousandth, different rates may apply to them." And again—"A tax upon gross receipts affects each transaction in proportion to its magnitude and irrespective of whether it is profitable or otherwise." And the court concludes—"It [the statute] exacts from two persons different amounts for the privilege of doing exactly similar acts because the one has performed the act oftener than the other." The principles announced in that case would not seem to apply where the tax is imposed with identical impact on essentially similar transactions, but varies with respect to transactions which are reasonably classified by the legislature as being different.

It becomes important then to determine what is the "transaction" being taxed. Plaintiffs take the position that by application of the rule that a tax on the privilege of making sales measured by the aggregate of sales made by a single taxpayer is equivalent to a tax on the individual sales, a tax on the gross daily play at a track is equivalent to a tax on each sale of a ticket evidencing an interest in any pool operated during the presentation of the day's program

of racing. They point out that there is no material difference in mechanics between the issuance of the first and the thousandth or ten thousandth ticket issued by the pari-mutuel machines at a track, or the issuance of such a ticket at a track which conducts a daily pool of $200,000 and one which conducts a daily pool of only $40,000. From this premise they deduce that the tax which by the language of the Act is laid upon the operation of the pool is, in effect, a tax on each bet that is made and which constitutes a part of the daily pool—and therefore falls within the condemnation of the Stewart case.

While not without logic this argument overlooks the fact that the legislature has determined that the daily pool is the transaction to be taxed, that the tax is imposed on the track operator for the privilege not of selling individual chances but of conducting the pool—regarding the operation of the pool as a single taxable transaction. Of course, the force of the Stewart case cannot be avoided by artificial and unreasonable legislative determinations or evaded by the use of gross daily business instead of gross annual business as a basis for differentiation. If, however, there is any rational or reasonable basis supporting the legislative determination that the daily pool is a transaction in and of itself, or is composed of various units and elements so closely related to each other as to justify the legislature in determining that the operation of the pool is a single taxable transaction then the Stewart case is not controlling.

In order to determine this question it is necessary to analyze the operation of a "daily pool." First, the track must have a physical plant suitable for the conduct of the races, including the machines necessary for the operation of the pari-mutuel betting system. This is no different, legally, from the maintenance of a store building by a merchant. Next, the track must arrange with kennels to enter dogs in the various races. This is done by offering purses to the winning kennels. It may not be too much of a stretch of the imagination to compare this expense to the cost of merchandise with which a store is stocked. Next, it is necessary to entice within the enclosure of the track a sufficient number of the public with sufficient betting ability and inclination so as to create pari-mutuel pools covering the various phases of the various races, win, place, show, quinella, and, usually a daily double. In order for the track to be financially successful a number of races, usually ten, must be run on each racing program, and the money bet on each race must be paid back (less the track's percentage) to the winners before the next race is run, so that this money may be available for betting on the next race. Under the laws of this state the only places where betting on

dog races is legal is within the enclosure of the track. In order for the public to legally bet on the races they must purchase the right to enter the track. Even if the track operator charges nothing a tax must be paid on the admission. The record shows that the tracks charge for this admission and obtain substantial revenue therefrom. Once a member of the public has purchased the right to enter the track, or, in other words, paid for the privilege of betting on the races to be run on a particular program, he may lawfully bet on any or all of the races appearing on the program but no other. The evidence shows that the successful operation of the track, i.e. the profitable operation of the pari-mutuel betting system, depends on the money brought to the track by the public being turned over a number of times during the course of a single program. The operation of a "daily pool" is thus demonstrated to be essentially different from the operation of a department store. The group of patrons who pay for the privilege of betting, pay for the privilege of betting on all the races of a program. The same money that is bet on one race on the program is, to a considerable degree bet on others, and the measure of the daily pool is largely determined by the extent and frequency of this turnover. All of the money is brought within the enclosure, the only place where it may be legally bet, by reason of the payment of one admission fee by each patron. The track owner is granted a permit to operate these betting pools, the tax is assessed on each daily pool based upon the size of that daily pool, regardless of the size of any other pool which the track may have conducted on any other day during the racing season and regardless of the number of pools operated during a racing season.

The fact that the legislature regarded the operation of a program of races as the transaction giving rise to a daily pool of pari-mutuel betting, and the unit of taxation, is made clear by the provision of the statute declaring that when a track presents a matinee and a night program they shall be taxed separately, and the schedule of the tax rates applied separately to the two pools so created.

Under the circumstances above outlined this court cannot say that the action of the legislature in determining that the various factors that go into the creation of and the conduct of a daily pool of pari-mutuel betting are so closely related to and interwoven with each other that, for taxing purposes, the operation of such a pool may be regarded as a single transaction, is so capricious, arbitrary and unreasonable as to offend the constitution.

In order to claim the benefit of the ruling in the Stewart case, and similar decisions, plaintiffs take the position that a sale of

pari-mutuel tickets, evidencing interests in wagers made upon the results of dog races is analogous to the sale of items of merchandise by storekeepers. This implies an analogy between the operation of a pari-mutuel betting system and the conducting of a retail business in selling any form of personal property. A more apt comparison would be to study the points of similarity between betting on dog races and a game of cards, such as poker. Both are gambling—a form of activity quite different from merchandising. In both the winners are determined partly by luck and partly by skill. In both a series of independent but related events occur upon the outcome of which winners are determined. In such a card game a number of deals are made and as to each deal a pot or pool is made up of money bet and the player with the highest hand, as determined by definite rules, wins the money bet. A number of such deals in which the same players participate following each other in succession constitute a game. In dog racing a series of races is run in succession and the patrons of the track select and bet on dogs to win, place or show in the various races. Separate pools are made up of the money so bet and the pools are divided among the winners according to certain definite rules. Such a series of races is a racing program. A card game as a basis of gambling has been regarded by legislatures and courts as a single entity, made up of the various deals of the cards that go to make up such a game. Johnson v. McGregor (Ill.), 41 N. E. 558; Caldwell v. Caldwell (Ky.), 2 Bush 446; Crooks v. McMahon, 48 Mo. App. 48. It would seem to be equally logical to consider a racing program as a single entity for the purpose of taxation.

Having reached the conclusion that the unit of taxation is the daily pool, rather than the individual bet of the track patron, it is next necessary to consider the constitutional validity of the classification of daily pools and the taxing of daily pools of different sizes at different rates of taxation. The Stewart case is not here controlling or even in point except as it reiterates the well established rule that classification for taxing purposes must be based on some substantial difference between the various classes established and may not be purely arbitrary and capricious.

This is an unusual, if not a unique case involving the application of the equal protection clause to a taxing statute in that the court has the benefit of having before it a financial statement and record of the actual operation of every taxpayer who currently is, or in the foreseeable future will be affected by the operation of the law.

There are fourteen dog racing tracks in Florida, and the law is such that no additional competing track can be licensed to operate within 100 miles of any of them. The geographical location of the

existing tracks is such that the probability of the establishment of other tracks even more than 100 miles from existing tracks is rather remote. All tracks are required to file annual financial statements with the Racing Commission, and presumably the legislature had knowledge of the actual operating experience of each track when it enacted the statute.

Under the pre-existing law all tracks were taxed on the basis of a fixed percentage of the mutual play at the tracks, with the exception of those tracks having a very small mutual play which were permitted to operate upon a flat tax of $500 per day. Under this law actual experience disclosed that there was a definite relationship between mutuel play and net profits. In measuring the validity of the statute it is proper to consider profits before federal income taxes, not because such taxes are not an inescapable obligation of every business, but because such taxes are themselves based on income and, particularly in cases where, as here, excess profits taxes are involved, they may distort the picture in determining whether the classification is so unreasonable that the equal protection of the laws has been denied.

| Track | Mutual Play | Net Income Before Taxes | Purses | Play per Dollar of Purse |
|---|---|---|---|---|
| Key West K.C. | 1,511,077.00 | —47,642,68 | 73,334.00 | 20.61 |
| Pensacola K.C. | 2,743,819.00 | 65,622.23 | 83,783.20 | 32.74 |
| Orange Park K.C. | 3,643,576.00 | 100,999.39 | 109,897.00 | 33.15 |
| Sanford-Orlando K.C. | 3,804,793.00 | 233,026.25 | 94,350.00 | 40.33 |
| Jacksonville K.C. | 4,429,777.00 | 148,694.39 | 136,995.00 | 32.33 |
| Sarasota K.C. | 5,001,262.00 | 293,882.47 | 128,976.60 | 38.71 |
| Assoc. Outdoor Clubs | 7,560,686.00 | 329,913.97 | 217,588.00 | 34.75 |
| Palm Beach K.C. | 7,939,943.00 | 109,214.74 | 199,219.00 | 39.85 |
| Volusia County K.C. | 8,586,540.00 | 274,118.99 | 196,092,03 | 43.79 |
| Miami Beach K.C. | 12,647,070.00 | 542,176.96 | 311,960.00 | 40.55 |
| Broward County K.C. | 13,220,905.00 | 803,614.07 | 286,397.00 | 46.16 |
| St. Petersburg K.C. | 13,973,272.00 | 872,714.74 | 381,846.25 | 36.59 |
| West Flagler K.C. | 14,737,225.00 | 690,446.35 | 357,153.80 | 41.26 |
| Biscayne K.C. | 16,699,800.00 | 886,965.82 | 334,960.00 | 49.85 |

In the above schedule the tracks have been arranged in the order of their total mutual play during the last racing season, beginning with the lowest. The first column of figures shows the mutual play at each track. Column 2 shows the net income before income taxes of each track as reflected by the books of the track. It will be observed that the one track with a mutual play of less than two million dollars operated at a loss although it got the benefit of a flat tax of $500 a day instead of a percentage of the mutual play.

In a steady (although not exactly uniform) climb, track profits increased as mutual play increased until we find that the track with the highest play, Biscayne, earned net profits of $886,965.82 on a gross mutual play of $16,699,800. The five tracks having a play of less than five million dollars, with one exception, earned less than $150,000, while the five tracks with more than ten million dollars play all earned in excess of half a million dollars profit and averaged more than three quarters of a million dollars profit.

One of the major items of expense in the operation of a track, as disclosed by the evidence, is the amount of purses paid to the owners of winning dogs. It is significant that the ratio of mutual play to purses paid reflects a definite advantage to the tracks having the larger play. Key West, with a mutual play of $1,511,077 paid purses in the amount of $73,334 while Biscayne with a mutual play of $16,699,800 paid purses in the amount of $334,960. Thus it appears that for each dollar paid in purses Key West secured a mutual play of $20.61 while for each dollar in purses paid Biscayne secured a mutual play of $49.85, and the increased commissions based on this additional play. On the above schedule column 3 reflects the purses paid by each track and column 4 the dollars of mutual play for each dollar of purses paid. Again while not exactly uniform, the figures reflect a definite advantage to the tracks having the larger mutual play.

Of the tracks having a play of over ten million dollars only St. Petersburg shows a mutual play of less than forty dollars for each dollar of purses paid, and St. Petersburg shows the largest gross purses paid of any track although third highest in mutual play. This is explained when it is noted that the St. Petersburg track operated more matinee programs than any other track, presenting 120 programs in 90 days racing allowed by law. In presenting more programs they, of course, had to pay more winners thus increasing their mutual play, but at a higher cost in purses for each dollar of mutual play.

An examination of the auditors' reports from all the taxpayers affected by the statute under consideration discloses a factual situation clearly justifying a legislative determination that there is a definite relationship between the amount of mutual play at, and the profits earned by the several tracks affected. Such a determination is a sufficient basis for the imposition of taxes at different rates upon the various daily pools operated by the several tracks measured by the size of the individual pools with respect to which the tax is imposed.

The tax here under consideration is a tax upon a privilege. All those licensed to operate pari-mutuel pools are taxed exactly the same with respect to pools of the same size. The fact, which is established by the evidence, that some tracks are so situated with respect to physical facilities and centers of population that they probably will not in the foreseeable future exceed the lowest bracket, does not in any way affect the constitutionality of the statute. The physical facilities of a track are matters entirely under the control of the owners of the tracks, as is also its location with respect to the number of prospective patrons within a reasonable radius of the track.

In the case of Magoun v. Illinois Trust & Savings Bank, 170 U. S. 283, 18 S. Ct. 591, 42 L. ed. 1037, the United States Supreme Court sustained a statute imposing an inheritance tax at different rates based on the value of the legacies to persons not of kin to the testator, estates in the higher brackets being taxed throughout at the higher rates. Under this statute the only difference between an estate of $10,000 and one of $10,001 was one dollar in value, yet the ten thousand dollar estate was taxed at one rate and the entire $10,001 estate taxed at a higher rate. The result was that the larger inheritance paid so much tax that the beneficiary actually received less. The court held that the tax was on the privilege of receiving the legacy and the legislature could make the classification and impose the tax without denying the equal protection of the laws. The right to operate pari-mutuel betting pools is a privilege granted by Florida law to certain favored parties. Under the authority of this decision, the Florida legislature may impose different rates of taxation upon the privilege of conducting pari-mutuel pools of different sizes, without denying any of these parties the equal protection of the laws.

As to the contention that the operation of the statute under attack deprives plaintiffs of their property without due process of law, but little need be said. According to Biscayne's report to the Racing Commission, in its last year's operations it earned a net profit before federal income taxes of $886,965.82. Had the present law been in operation during the same period the net profit before federal income taxes would have been the sum of $248,892.84. After paying federal income taxes the income would be $124,954.17. The bill in this case alleges the value of Biscayne's plant to be $925,000.

According to Volusia's report to the Racing Commission in its last year's operations it earned a net profit before federal income taxes of $274,118.99. Had the present law been in operation during the same period the net profits before federal income taxes would

have been the sum of $158,331.38. The testimony of a qualified appraiser offered as Volusia's witness places the replacement cost of Volusia's plant at $575,000.

The foregoing figures in arriving at net income include several items of deductions from gross income which would receive close scrutiny were the question here presented even a close one. For example: Biscayne paid officers' salaries in the amount of $85,000 in addition to salaries of "department heads" in the amount of $56,800. During the last fiscal year Biscayne paid to named persons for "legal and audit" expenses $41,430.36, and still deducts from gross income an item of "accrued estimated legal expense" in the amount of $85,000. In addition to detailed advertising expenses including items for newspapers, programs, radio, outdoor photographing, agency service and miscellaneous, aggregating $94,429.06, Biscayne charges as an expense an item under "miscellaneous services and supplies" of "publicity, general (estimated)" in the amount of $50,000, and "contributions" $45,265. The last annual statement of Volusia shows officers' salaries $70,583.40, depreciation (unexplained) $73,072.42 (the testimony is that the current replacement cost of the plant, including real estate is $575,000) and donations and contributions $10,257.72, and travel $14,440.94 (there may or may not be some connection between this item and the yacht shown as an asset of the corporation).

The court does not rule that all, or any, of these items of operating expenses are in any way improper or excessive. However, they are of such a nature that a showing of their reasonableness would be required before they would be considered proper deductions in determining that a fair return on invested capital could not reasonably be expected if the tax under attack is paid. Since a reasonable return upon capital invested is shown by plaintiffs' own figures even allowing these items of expense, further consideration of them is unnecessary.

It is therefore considered, ordered, adjudged, declared and decreed, as follows—

1. The moneys required by chapter 28,058, Laws of Florida, Acts of 1953, to be paid by persons operating dog race tracks in Florida, to the state of Florida are taxes.

2. Such taxes are taxes levied upon the persons operating the tracks rather than persons betting on dog races conducted at such tracks.

3. The taxes so imposed are for the privilege of operating parimutuel betting pools at such dog race tracks.

4. For the purpose of taxation the legislature has regarded the entire amount of money bet upon all the races conducted upon a single program as a single "daily pool" and the tax as regards each single daily pool is assessed as a tax upon a single taxable transaction.

5. Under the peculiar circumstances under which dog races, and betting upon dog races are permitted under the laws of Florida, the classification by the legislature of each daily pool as a single business transaction subject to taxation is not so arbitrary, capricious and unreasonable as to offend either the state or federal constitution.

6. The classification, for taxing purposes, of business transactions similar except as to size into different classes based on the size of such transactions, and the imposition of different rates of taxation on the different classes so determined when it affirmatively appears that there is a definite relationship between the size of such transactions and the profits derived therefrom does not deny persons engaging in larger transactions the equal protection of the laws.

7. The evidence before the court clearly indicates that there is a reasonable basis for a legislative determination that there is a definite relationship between the size of the daily pools operated by the several tracks operating under the statute and the profits made by such tracks in the past and to be reasonably anticipated in the future. The making of such legislative determination, when justified by the facts, will be presumed for the purpose of sustaining the constitutionality of a legislative enactment.

8. The plaintiffs have failed to establish by competent evidence that the impact of the tax imposed by chapter 28,058, Laws of Florida, Acts of 1953, on their respective businesses is such that they will not in the future and after paying such tax each earn a reasonable return on the property devoted to their respective businesses.

9. The operation of chapter 28,058, Laws of Florida, Acts of 1953, does not deprive the plaintiffs, or either of them of their property without due process of law, or deny them the equal protection of the laws.

10. Chapter 28,058, Laws of Florida, Acts of 1953, is a valid constitutional legislative enactment.

11. The temporary restraining order heretofore entered in this cause is hereby dissolved.

12. The plaintiffs shall pay the costs of this proceeding.