Filed 3/8/21 (unmodified opinion attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| ASHFORD HOSPITALITY et al.,<br><br>      Plaintiffs and Appellants,<br><br>v.<br><br>CITY AND COUNTY OF SAN FRANCISCO,<br><br>      Defendant and Respondent. | A159181<br>(City & County of San Francisco<br>Super. Ct. No. CGC-15-549018)<br><br>ORDER MODIFYING OPINION<br>AND DENYING REHEARING;<br>NO CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the opinion filed herein on March 1, 2021, be modified as follows:

On page 2, lines 3 and 4, delete the sentence "The transfer tax is an excise tax on the privilege of recording a document when ownership of real property is transferred" and insert the following sentence in its place:

      The transfer tax is an excise tax on the conveyance of real property.

There is no change in the judgment.

Respondent's petition for rehearing is denied.


Date: March 8, 2021                               POLLAK, P.J.

1

Trial court:                                  San Francisco County Superior Court

Trial judge:                                  Honorable Kathleen A. Kelly

Counsel for plaintiffs and appellants:        AJALAT, POLLEY, A YOOB & MATARESE
                                              Richard J. Ayoob
                                              Christopher J. Matarese
                                              Gregory R. Broege

                                              Thomas A. Nuris

Counsel for defendant and respondent:         Dennis J. Herrera, City Attorney
                                              Scott M. Reiber, Chief Tax Attorney
                                              Thomas S. Lakritz & Carole F. Ruwart,
                                              Deputy City Attorneys

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| ASHFORD HOSPITALITY et al.,<br><br>    Plaintiffs and Appellants,<br><br>v.<br><br>CITY AND COUNTY OF SAN FRANCISCO,<br><br>    Defendant and Respondent. | A159181<br><br>(City & County of San Francisco Super. Ct. No. CGC-15-549018) |

Ashford Hospitality Limited Partnership and Ashford San Francisco II LP (collectively Ashford) appeal the judgment entered in favor of the City and County of San Francisco (the city) on Ashford's complaint seeking a refund of taxes paid in connection with the transfer of ownership of real property. Ashford contends the trial court erred in concluding that the city's "Real Property Transfer Tax Ordinance" (S.F. Bus. & Tax Regs. Code, art. 12-C,[1] hereafter transfer tax) does not violate the Equal Protection Clause of the United States Constitution (U.S. Const., 14th Amend.). We find no error and shall affirm the judgment.

---

[1] All further statutory references are to article 12-C of the city's Business and Taxation Regulations Code.

**Background**

*1. Legal Background*

The transfer tax is an excise tax on the privilege of recording a document when ownership of real property is transferred. (§ 1102 et seq.; see also *Fielder v. City of Los Angeles* (1993) 14 Cal.App.4th 137, 145 ["A transfer tax attaches to the privilege of exercising one of the incidents of property ownership, its conveyance."] The transfer tax has five tiered or graduated tax rates. At the lowest tier, if the consideration for or value of the realty sold exceeds $100 but is less than or equal to $250,000, tax is imposed at the rate of $2.50 for each $500 (or fractional part thereof). At the highest tier, if the consideration or value of the realty sold exceeds $25,000,000, tax is imposed at the rate of $15 for reach $500 (or fractional part thereof) of the entire value or consideration. (§ 1102.)[2]

---

[2] In 2013, when the relevant transfer occurred, section 1102 read: "There is hereby imposed on each deed, instrument or writing by which any lands, tenements, or other realty sold within the City and County of San Francisco shall be granted, assigned, transferred or otherwise conveyed to, or vested in, the purchaser or purchasers, or any other person or persons, by his or her or their direction, when the consideration or value of the interest or property conveyed (not excluding the value of any lien or encumbrances remaining thereon at the time of sale) [¶] (i) exceeds $100.00 but is less than or equal to $250,000, a tax at the rate of $2.50 for each $500 or fractional part thereof; or [¶] (ii) more than $250,000 and less than $1,000,000, a tax at the rate of $3.40 for each $500 or fractional part thereof for the entire value or consideration, including, but not limited to, any portion of such value or consideration that is less than $250,000; or [¶] (iii) at least $1,000,000 and less than $5,000,000, a tax at the rate of $3.75 for each $500 or fractional part thereof for the entire value or consideration, including, but not limited to, any portion of such value or consideration that is less than $1,000,000; or [¶] (iv) at least $5,000,000 and less than $10,000,000, a tax at the rate of $10.00 for each $500 or fractional part thereof for the entire value or consideration, including, but not limited to, any portion of such value or

## 2. *Factual Background*

Ashford San Francisco Limited Partnership owns real property located on 2nd Street in the city. In November 2013, a majority ownership interest in Ashford San Francisco was acquired by Ashford Hospitality Prime Limited Partnership. The transfer of the majority interest of Ashford San Francisco resulted in a change in ownership of the 2nd Street property which the city determined triggered the imposition of the transfer tax. Accordingly, Ashford paid $3,348,025 in transfer taxes to the city based upon the $133,920,700 self-reported value of the property. Thereafter, Ashford filed an administrative claim for refund pursuant to section 1113. When the city did not act on the claim in the time required by law, Ashford deemed the claim denied and filed the present action seeking a refund for the total amount paid plus interest.

Ashford's complaint, as amended, alleges that the transfer tax "imposes different tax rates on taxpayers for performing the same exact function (transferring property via a written instrument)" and "arbitrarily classifies property transfer instruments for the imposition of a varying rate of taxation, solely by reference to the amount of the consideration in the transactions" in

_____

consideration that is less than $5,000,000; or [¶] (v) at least $10,000,000 and above, a tax at the rate of $12.50 for each $500 or fractional part thereof for the entire value or consideration, including but not limited to, any portion of such value or consideration that is less than $10,000,000." As amended in 2016, section 1102 modified the fifth tier and added a sixth tier: "at least $10,000,000 and less than $25,000,000, a tax at the rate of $13.75 for each $500 or fractional part thereof for the entire value or consideration, including but not limited to, any portion of such value or consideration that is less than $10,000,000; or (f) at least $25,000,000, a tax at the rate of $15 for each $500 or fractional part thereof for the entire value or consideration, including but not limited to, any portion of such value or consideration that is less than $25,000,000."

3

violation of the Equal Protection Clause of the United States Constitution. [3] Following a bench trial, the court entered judgment in favor of the city. The court concluded the city "has rationally chosen to treat the sale or transfer of a higher valued property differently from the sale of a lower valued property," and that the city's transfer tax "taxes all transfers of the same consideration or value equally." The trial court noted that while the city had advanced the property owner's "ability to pay" as a justification for the different rates, it also set forth additional reasons unrelated to a property owner's ability to pay, including that "the time and costs associated with the city's audits for the self-reported transfer tax may increase depending on the value of the property. An audit of a billion dollar tower is going to take more time and be more costly to the city versus an audit of a single family home for one million."

Ashford timely filed a notice of appeal.

**Discussion**

" 'Principles of equal protection require "that persons who are similarly situated receive like treatment under the law and that statutes may single out a class for distinctive treatment only if that classification bears a rational relationship to the purposes of the statute. Thus, if a law provides that one subclass receives different treatment from another class, it is not enough that persons within that subclass be treated the same. Rather, there must be some rationality in the separation of the classes." [Citation.]' [Citation.] [¶] In considering whether a tax is consistent with equal protection principles, 'courts will look for a rational basis for the class of persons selected to pay the

---

[3] Ashford's complaint also challenged the city's determination that a qualifying change on ownership occurred. However, for purpose of this appeal Ashford concedes that there was a change in ownership justifying the imposition of the transfer tax "if the tax is constitutional."

4

tax. Additionally, the classification must bear a reasonable relation to a legitimate governmental purpose. Arbitrary and capricious classifications are not permitted. [Citation.] The persons who are to pay the tax must be a "reasonably justifiable subclassification" of persons; otherwise, "the operation of the tax must be such as to place liability therefor equally on all members of the class." ' [Citation.] [¶] Under the rational basis test, ' "[w]e will not overturn such a [law] unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the [people's] actions were irrational." ' [Citation.] This deference is particularly important in the context of complex tax laws." (*City of Santa Cruz v. Patel* (2007) 155 Cal.App.4th 234, 247–248.)

The transfer tax ordinance sorts taxpayers into different classifications based on the gross value of the property sold and taxes them at differing rates according to their classification. In the trial court, the city posited several rationales for its tiered approach in addition to the property owner's ability to pay and the increased workload required for audits on higher valued properties. These include that "higher value properties may impose more costs on the city because of their use, size, and location, and impose higher police, fire, other general fund costs on the city" and "higher value properties are also less likely to be single-family residential homes, and the [city's Board of Supervisors] and voters may have wanted to favor such properties." [4]

---

[4] Ashford's briefing disregards the additional justifications proffered by the city and seems to suggest that the city's primary motivation for using gross sales to classify taxpayers is that gross receipts provide an easy approximation of the property owner's ability to pay a larger tax. It is,

Ashford contends that long-standing United States Supreme Court authority, *Stewart Dry Goods Co. v. Lewis* (1935) 294 U.S. 550 (*Stewart Dry Goods*), precludes the use of gross sales as a means of classifying taxpayers and that, in fact, the transfer tax applies to only one classification of persons, those who sell real property. It argues the city improperly imposes different tax rates on the same activity based solely on the gross value of the sale.

In *Stewart Dry Goods, supra,* 294 U.S. 550, the court invalidated a graduated gross receipts tax imposed on the retail sale of merchandise under which the rate of tax increased as the total gross receipts of all sales increased. The statute taxed similar transactions differently depending on the amount of receipts obtained from previous transactions. The court described the tax as follows: "All retailers, individual and corporate, selling

---

however, "entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature." (*Federal Communications Com. v Beach Communications* (1993) 508 U.S. 307, 315.) "[A] statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge *if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.* [Citations.] Where there are '*plausible reasons'* for [the classification] 'our inquiry is at an end.' " (*Id.* at p. 313, italics added.)

In any event, evidence in the record suggests that the city and voters were indeed concerned that higher valued properties should shoulder their fair share of the costs for city services. For example, proponents of proposition N on the ballot in 2010, which increased the real property transfer tax on properties valued at over $5 million, argued that "Proposition N will help reduce [cuts to city services] while ensuring that millionaire commercial property owners pay their fair share for the services they use. [¶] Large downtown properties use services, too. [¶] Prop N only impacts buildings sold for $5 million or more. These buildings require millions of dollars of city services including public safety, street cleaning, transit and health care. [¶] Isn't it only fair that commercial property owners, not just residents and employees, pay their share for the cost of city services." (Ballot Pamp., Gen. Elec. (Nov. 2, 2010) rebuttal to opponent's argument against Prop. N, p. 161.)

every description of commodities, in whatever form their enterprises are conducted, make up the taxable class. And the excise is laid in respect of the same activity of each of them — the making of a sale. Although no difference is suggested, so far as concerns the transaction which is the occasion of the tax, between the taxpayer's first sale of the year and his thousandth, different rates may apply to them. The statute operates to take as the tax a percentage of each dollar due or paid upon every sale, but increases the percentage if the sale which is the occasion of the tax succeeds the consummation of other sales of a specified aggregate amount." (*Id*. at p. 556.) The court concluded that "the operation of the statute is unjustifiably unequal, whimsical, and arbitrary, as much so as would be a tax on tangible personal property, say cattle, stepped up in rate on each additional animal owned by the taxpayer, or a tax on land similarly graduated according to the number of parcels owned." (*Id*. at p. 557.) The court held that the graduated tax could not be justified by a merchant's ability to pay because the gross receipts tax was imposed regardless of whether a merchant made a profit. (*Id*. at pp. 560–561.)[5]

---

[5] In dissent, Justice Cardozo criticized the majority's conclusion that gross receipts bear no reasonable relation to ability to pay: "In the view of the majority, the relation between the taxpayer's capacity to pay and the volume of his business is at most accidental and occasional. In the view of the Legislature of Kentucky and of its highest court [citation], the relation, far from being accidental or occasional, has a normal or average validity, attested by experience and by the judgment of trained observers. The one view discovers in the attempted classification an act of arbitrary preference among groups essentially the same. The other perceives in the division a sincere and rational endeavor to adapt the burdens of taxation to the teachings of economics and the demands of social justice." (*Stewart Dry Goods Co., supra*, 294 U.S. at p. 566.) Whatever the merits of Justice Cardozo's dissent, the majority's conclusion that gross receipts is not a reasonable

The city's transfer tax is distinguishable from the gross receipts tax in *Stewart Dry Goods, supra,* 294 U.S. 550 in significant ways. Although the transfer tax uses gross value or consideration to classify taxpayers, the classification is justified by more than the taxpayers purported ability to pay. Gross value is not used solely as a proxy for profit. Rather, as the city argues, the classifications are supported by practical considerations, including the amount of work required to process the transfer of higher valued property and the city's interest in fairly allocating the costs of servicing higher valued properties. Ashford does not dispute that the city's proffered justifications are rational. Rather, it argues that under *Stewart Dry Goods* gross value or the amount of consideration can never provide a reasonable basis for classifying taxpayers. We disagree. *Stewart Dry Goods* merely holds that classifying taxpayers, for the purpose of imposing a sales tax, based on gross sales of items other than the item being sold is arbitrary and irrational if the justification is the taxpayer's purported ability to pay. (*Id.* at pp. 557–559.) As the trial court concluded, "the city has rationally chosen to treat the sale or transfer of a higher valued property differently from the sale of a lower valued property" based on factors other than ability to pay.

The city also notes that the transfer tax is different from the tax at issue in *Stewart Dry Goods, supra,* 294 U.S. 550 because it applies to all transfers of the same consideration or value equally. In contrast, in *Stewart Dry Goods* the court faulted the graduated gross receipts tax because "[i]t exact[ed] from two persons different amounts for the privilege of doing

approximation of a taxpayer's ability to pay remains good law. (See *Brainerd Area Civic Ctr. v. Commissioner of Revenue* (Minn. 1993) 499 N.W.2d 468, 470 ["While the [*Stewart Dry Goods*] holding has been criticized and has engendered somewhat checkered progeny,[] the decision itself has remained intact all these years."].)

exactly similar acts because the one has performed the act oftener than the other." (*Id.* at p. 566.) Ashford disputes that volume of sales was a material consideration in *Stewart Dry Goods* and offers the following example to demonstrate the shortcomings of the city's analysis: "For example, if a street vendor sells five $50 hats (total $250) and a luxury high-end fashion store owner sold one $250 hat (total $250), the Stewart Dry Goods Tax would apply the same tax rate to both retailers *regardless of the volume of sales.* Instead, if the luxury high-end fashion store owner had sold one $50,000 hat, then the Stewart Dry Goods Tax would apply different tax rates to each retailer, again *regardless of the volume of sales.* The Supreme Court in *Stewart Dry Goods* did not look to the sheer volume of sales or the repeat nature of the business, in and of itself. Instead, the Supreme Court focused on how the taxing scheme subjected persons similarly circumstanced to different tax rates based on a different amount of gross sales receipts." But here, if a property owner sells two houses each valued $250,000, both transfers are taxed at the rate of $2.50 for each $500 or fractional part thereof. In contrast, if a property owner sells one house valued at $500,000, the transfer is taxed at the increased rate of $3.40 for each $500 or fractional part thereof for the entire value. Unlike the tax found to be unconstitutional in *Stewart Dry Goods*, the taxpayers are not charged either rate based on the total value of other sales. Their tax rate is based on the gross value of each individual property sold and they are taxed at that rate no matter how many other sales they make.

As the trial court noted, while no case seems to have specifically addressed the constitutionality of a tiered real property transfer tax, it is "persuasive . . . that the [United States] Supreme Court has upheld tax tiers based on gross value or consideration" in other contexts. For example, in *Magoun v. Illinois Trust & Savings Bank* (1898) 170 U.S. 283, the court held

9

that the state's inheritance tax which imposed different rates of taxation on legacies to four classifications of non-family members, classified according to the value of the estate received, did not violate the Equal Protection Clause.[6] The court explained, "There are four classes created, and manifestly there is equality between the members of each class. Inequality is only found by comparing the members of one class with those of another. It is illustrated by appellant as follows: One who receives a legacy of $ 10,000 pays 3 per cent., or $ 300, thus receiving $ 9,700 net, while one receiving a legacy of $ 10,001 pays 4 per cent on the whole amount, or $ 400.04, thus receiving $ 9,600.96, or $ 99.04 less than the one whose legacy was actually $ 1 less valuable. This method is applied throughout the class. [¶] . . . [¶] . . . If there is inequality, it must be because the members of a class are arbitrarily made such, and burdened as such, upon no distinctions justifying it. This is claimed. It is said that the tax is not in proportion to the amount but varies with the amounts arbitrarily fixed, and hence that an inheritance of $ 10,000 or less pays 3 per cent, and that one over $ 10,000 pays, not 3 per cent on $ 10,000, and an increased percentage on the excess over $ 10,000, but an increased percentage on the $ 10,000 as well as on the excess; and it is said, as we have seen, that in consequence one who is given a legacy of $ 10,001 by the deduction of the tax receives $ 99.04 less than one who is given a legacy of

_____

[6] The tax rates on these legacies were specified in the statute as follows: " 'On each and every hundred dollars of the clear market value of all property and at the same rate for any less amount; on all estates of ten thousand dollars and less, three dollars; on all estates of over ten thousand dollars and not exceeding twenty thousand dollars, four dollars; on all estates over twenty thousand dollars and not exceeding fifty thousand dollars, five dollars, and on all estates over fifty thousand dollars, six dollars: provided, that an estate in the above case which may be valued at a less sum than five hundred dollars shall not be subject to any duty or tax.' " (*Magoun v. Illinois Trust & Savings Bank, supra,* 170 U.S. at p. 299.)

$ 10,000. But neither case can be said to be contrary to the rule of equality of the Fourteenth Amendment. That rule does not require, as we have seen, exact equality of taxation. It only requires that the law imposing it shall operate on all alike, under the same circumstances. The tax is not on money; it is on the right to inherit, and hence a condition of inheritance, and it may be graded according to the value of that inheritance. The condition is not arbitrary because it is determined by that value; it is not unequal in operation because it does not levy the same percentage on every dollar; does not fail to treat 'all alike under like circumstances and conditions, both in the privilege conferred and the liabilities imposed.' " (*Id.* at pp. 299–301.) Subsequently in *Keeney v. Comptroller of State of New York* (1912) 222 U.S. 525, 526, 534, the court upheld an excise tax that imposed an inheritance tax upon property transferred inter vivos where the amount of a tax was measured by the value of property conveyed. Citing *Magoun,* the *Keeney* court overruled the plaintiff's equal protection challenge noting simply that "it is sufficient to say that it is now well settled that the State may impose a graduated tax in this class of cases." (*Id.* at p. 536.)

Ashford's attempt to distinguish these cases is not persuasive. It argues that because "the inheritance tax in *Magoun* was a net tax, not a gross tax, its reasoning and holding have no application to the analysis of the constitutionality of the Transfer Tax." We disagree. As explained in *Magoun*, *supra*, 170 U.S. at page 294, a legislative body "may distinguish, select, and classify objects of legislation, and necessarily this power must have a wide range of discretion" subject to the constitutional limitations imposed by the Equal Protection Clause. As discussed above, even if a classification based on gross value of a sale were deemed arbitrary and thus unconstitutional if gross value serves solely as a proxy for one's ability to pay, the same cannot be said

11

when gross value is used to classify taxpayers for reasons beyond ability to pay.

Finally, *Trump v. Chu* (1985) 65 N.Y.2d 20, relied upon by Ashford does not support the conclusion that the city's transfer tax violates the Equal Protection Clause. In that case, the New York Court of Appeals upheld a transfer tax which imposed a 10 percent tax on gains derived from real property transfers but exempted, among others, transfers for less than one million dollars. (*Id.* at p. 23.) The court rejected the argument that "by exempting transfers for less than one million dollars the gains tax treats identically situated taxpayers differently on the basis of varying levels of gross receipts, e.g., a taxpayer who sells his property for $ 999,999 and has a gain of $ 500,000 owes no tax whereas a taxpayer who sells his property for $ 1,000,001 and has a similar $ 500,000 gain must pay a tax of $ 50,000." (*Id.* at p. 24.) As in this case, the plaintiff in *Trump v. Chu* argued that the court's decision was controlled by *Stewart Dry Goods*. (*Id.* at p. 25.) The court summarized *Stewart Dry Goods* as follows: "In *Stewart Dry Goods*, the United States Supreme Court invalidated a graduated gross receipts tax imposed on the sale of retail merchandise because the rate of tax increased as the total gross receipts of sales increased. The statute taxed similar transactions differently, therefore, depending on the amount of receipts obtained from previous transactions. The only conceivable justification for this different treatment was that a merchant's net income and consequently his ability to pay the tax increased as his volume of sales increased [citation]. The court held this was not a rational basis for the tax because the gross receipts tax was imposed regardless of whether a merchant made a profit. Thus, merchants with a large volume of business but an actual net loss paid more tax than a low volume merchant with a substantial profit." (*Id.* at pp. 25–26.)

While the court broadly characterized *Stewart Dry Goods* as "hold[ing] that the Legislature may not classify taxpayers on the basis of gross receipts or sales volume for the purpose of imposing different tax rates and then utilize the amount of gross receipts to determine the amount of tax due as well" (*id.* at p. 26), this is only so if the taxpayer's gross receipts is being used as a proxy for their gain. The court explained, "So long as [the legislature] taxes only net gains, it rationally could believe that 'generally speaking' profits increase as the amount of gross consideration received increases." (*Id.* at p. 27.) Alternatively, the court in *Trump v. Chu* held that the classifications based on gross receipts may be justified by administrative considerations. " '[Administrative] convenience and expense in the collection or measurement of the tax are alone a sufficient justification for the difference between the treatment of small incomes or small taxpayers and that meted out to others. . . .' Since it is established that the Legislature may exempt some taxpayers on this basis, where it draws the line 'is peculiarly a question for legislative decision' [citation] especially in the field of taxation where, 'even more than in other fields, legislatures possess the greatest freedom in classification.' " (*Id.* at pp. 27–28.) Neither the questioned tax in *Trump v. Chiu* nor the city transfer tax uses gross receipts in the manner proscribed in *Stewart Dry Goods*. As in *Trump v. Chiu* and as discussed above, administrative convenience and expense posited by the city in this case justify the use of gross value to classify taxpayers under the challenged tax.

Thus, we agree with the trial court that the city's transfer tax does not violate the Equal Protection Clause.

## Disposition

The judgment is affirmed.

POLLAK, P. J.

WE CONCUR:

STREETER, J.
TUCHER, J.

Trial court:                                 San Francisco County Superior Court

Trial judge:                                 Honorable Kathleen A. Kelly

Counsel for plaintiffs and appellants:       AJALAT, POLLEY, AYOOB & MATARESE
                                             Richard J. Ayoob
                                             Christopher J. Matarese
                                             Gregory R. Broege

                                             Thomas A. Nuris

Counsel for defendant and respondent:        Dennis J. Herrera, City Attorney
                                             Scott M. Reiber, Chief Tax Attorney
                                             Thomas S. Lakritz & Carole F. Ruwart,
                                             Deputy City Attorneys